**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No.  09-CV-00717-CMA-BNB

BROKER'S CHOICE OF AMERICA, INC. and
TYRONE M. CLARK

      Plaintiffs,

v.

NBC UNIVERSAL, INC.,
GENERAL ELECTRIC CO.,
CHRIS HANSEN,
STEVEN FOX ECKERT, and
MARIE THERESA AMOREBIETA

      Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT**

---

This matter is before the Court on Defendants' Motion to Dismiss Amended

Complaint (Doc. # 49).  The case involves an NBC *Dateline* program concerning

questionable practices of insurance annuity salesmen.

## I.  BACKGROUND[1]

### A.  INTRODUCTION

Plaintiff Broker's Choice of America, Inc.  ("BCA") operates as an Independent

Marketing Organization ("IMO") in the insurance industry.  (Doc. # 39 at ¶ 17.)  IMOs

---

[1]  The description/background of this case is derived from Plaintiffs' Amended Complaint
(Doc. # 39) and Defendants' Motion to Dismiss  (Doc. # 49).

enter into agreements with insurance companies to market their insurance products.
IMOs then recruit and make these insurance products available to independent licensed
insurance agents who, in turn, market these products to consumers.  (*Id.*)  BCA was
founded by Plaintiff Tyrone M. Clark ("Clark").  During the relevant period, Clark was the
majority owner of BCA and served as BCA's CEO.  (*Id.*, ¶ 18.)

Defendant NBC Universal ("NBCU") produced a television report ("Report")
broadcast on *Dateline NBC* ("*Dateline*"), which focused on the predatory sales tactics
used in the sale of equity-indexed annuities ("EIAs") to senior citizens.  (Doc. # 49 at 9.)
The Report included a segment about training sessions for insurance agents marketed
by BCA under the name Annuity University ("AU").  (Doc. # 39 at ¶ 20.)  AU is a two-day
training session BCA offers to insurance agents on the sale of annuities.  (*Id.*, ¶ 24.)
AU seminars are taught by Clark in Centennial, Colorado, in a building owned by a
Clark-owned company and leased exclusively to BCA.  (*Id.*, ¶ 21.)  In order to register
with BCA for an AU seminar, participants must be licensed insurance agents, *i.e.*,
AU seminars are not open to the general public.  (*Id.*, ¶ 22, 79.)

*Dateline* is a weekly television broadcast produced by NBCU and broadcast
on NBC affiliated television stations.  (*Id.*, ¶ 31.)  In 2007, *Dateline* began an
investigation into the tactics used by insurance agents selling EIAs to senior citizens.
(Doc. # 49 at 12.)  Defendant Chris Hansen headed the investigation.  (*Id.*)  As part of
its investigation, *Dateline* arranged for volunteers in Arizona and Alabama to pose as
potential customers of insurance agents.  These volunteers were equipped with hidden

cameras to record the agents' sales pitches.  (Doc. # 39, ¶ 52.)  During the sales

pitches, the insurance agents failed to disclose the risks associated with EIAs, including

the substantial penalties for withdrawing the funds before their maturity dates.  (*Id.*,

¶ 76.)

 Because annuities are insurance products and the return on fixed-indexed

annuities is tied to various securities indexes, the Alabama Department of Insurance

("ALDOI") and the Alabama Securities Commission ("ASC") were interested in

regulating the sale and marketing of fixed-indexed annuities.  (*Id.*, ¶ 47.)  ALDOI and

ASC formed a joint task force with the Alabama Attorney General's Office ("AAG's

office") with the intent to "work together in investigating and prosecuting improper

annuities sales practices."  (*Id.*, ¶ 48.)  The joint task force was named the Alabama

Annuities Task Force ("AATF").  (*Id.*, ¶ 49.)  The purpose of the AATF was to "work

jointly on investigations of annuity sales, particularly as they apply to the suitability of

the products sold to Alabama consumers."  (*Id.*, ¶ 50.)  Subsequently, AATF and

*Dateline* investigated whether misleading, abusive, and criminal annuity sales practices

were being conducted in Alabama.  (*Id.*, ¶¶ 51-52.)  *Dateline* and the AATF officials

decided their investigation should include the training of insurance agents in marketing

annuities.  (*Id.*, ¶ 53.)

**B.** **THE DATELINE INVESTIGATION**

 In October of 2007, *Dateline* producers Steven Fox Eckert and Marie Theresa

Amorbieta registered for a two-day session at AU held on October 25 and 26, 2007.

(Doc. # 39, ¶ 58.)  ALDOI issued Alabama insurance producer licenses to Eckert and

Amorebieta with the agreement that they not sell insurance products with these licenses

and that they return the licenses immediately after surveilling and gathering evidence

about the AU class.  (*Id.*, ¶ 57.)  BCA checked the licensing status of Eckert and

Amorebieta and admitted them to the BCA premises to attend AU.  (*Id.*, ¶ 59.)  Eckert

and Amorbieta attended and recorded the classes.  Some of the recorded footage was

included within the Report which aired on April 13, 2008.  (*Id.*, ¶¶ 60-61, 72.)

## II.  PROCEDURAL HISTORY

Plaintiffs initiated this action on March 31, 2009.  (Doc. # 1.)  In their original

Complaint, Plaintiffs asserted the following claims against Defendants: defamation,

trespass, fraud, intrusion, and violation of 42 U.S.C. § 1983.  On June 1, 2009,

Defendants filed a Motion to Dismiss for failure to state claims upon which relief could

be granted.  (Doc. # 10.)  On October 22, 2009, the Court granted the Motion to

Dismiss, without prejudice.  (Doc. # 38.)  On November 20, 2009, Plaintiffs filed an

Amended Complaint and Jury Demand.  (Doc. # 39.)  The primary differences between

the factual allegations in the original Complaint and those in the Amended Complaint

are that the Amended Complaint includes statements from a sales training seminar in

March 2007 (the "March 2007 Seminar") and Plaintiffs' original claims for trespass,

fraud and intrusion are no longer alleged, *i.e.*, Plaintiffs now alleges only two claims for

relief – defamation and violation of 42 U.S.C. § 1983.  For purposes of this order, the

Court assumes, as asserted by Plaintiffs, that the March 2007 Seminar "includes

discussions of the same topics presented at all Annuity University classes," including the October 2007 Seminar covered in the Report, and that it "provides in substance the true context of the snippets selected by *Dateline* . . . . " (Doc. # 39, ¶ 65).

On December 22, 2009, Defendants filed a Motion to Dismiss the Amended Complaint, again asserting that Plaintiffs failed to state claims upon which relief can be granted. (Doc. # 49.) On January 21, 2010, Plaintiffs filed an Amended Brief in Opposition to Defendants' Motion to Dismiss the Amended Complaint. (Doc. # 61.) On February 5, 2010, Defendants filed a Response to Plaintiffs' Amended Brief. (Doc. # 64.)

## III.   STANDARD OF REVIEW

A court reviewing the sufficiency of a complaint assumes the truth of all well pleaded facts in the complaint, and draws all reasonable inferences therefrom in the light most favorable to the plaintiffs. *Teigen v. Renfrow,* 511 F.3d 1072, 1078 (10th Cir. 2007). In order to defeat a motion to dismiss under Rule 12(b)(6), Plaintiffs must demonstrate that the Amended Complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *see also Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1960 (2009). Plaintiffs need not prove their case at this point; rather, they need only allege a plausible claim for relief. Their "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

## IV.  ANALYSIS

Plaintiffs assert two claims in their Amended Complaint: (1) defamation, based on clips of the October 2007 Seminar that were used out of context; and (2) violation of 42 U.S.C. § 1983, grounded in the theory that *Dateline's* partnership with the state of Alabama transformed *Dateline* into a state actor.

## A.  **DEFAMATION CLAIM**

The tort of defamation exists to redress and compensate individuals who have suffered serious harm to their reputations due to the careless or malicious communications of others.  *Milkovich v. Lorain J. Co.,* 497 U.S. 1, 11 (1990); *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994).  A claim for defamation requires that the plaintiff prove, by a preponderance of the evidence, that the defendant published a defamatory statement.  If a public figure or a matter of public concern is involved, a heightened burden applies and plaintiff is required to prove a statement's falsity by clear and convincing evidence rather than a preponderance.  *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775 (1986); *Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39, 41 (Colo. App. 1996).  This heightened burden requires a plaintiff to demonstrate that the statements were made with actual malice, *i.e.*, with knowledge that the statements were false or made with reckless disregard as to their truth or falsity. *New York Times v. Sullivan,* 376 U.S. 254, 285-86 (1964); *see also Lockett v. Garrett,* 1 P.3d 206, 210 (Colo. App. 1997).  Actual malice can be shown if the defendant entertained serious doubts as to the truth of the statement or acted with a high degree

of awareness of its probable falsity.  *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1123 (Colo. App. 1992).  Under Colorado law, absolute truth is not required.  Instead, a defendant need only show substantial truth, *i.e.*, that "the substance, the gist, the sting of the matter is true."  *Gomba v. McLaughlin,* 180 Colo. 232, 236 (Colo. 1972).

The Court previously held that the *Dateline* Report was an issue of public concern.  It dismissed Plaintiffs' defamation claim because Plaintiffs failed to provide "non-conclusory factual allegations to support their claim for relief," and failed to allege sufficient facts demonstrating that Clark's statements in Defendants' Report were taken out of context and presented in a false light.  (Doc. # 38 at 3-6.)

In the Amended Complaint, Plaintiffs attempt to provide context for the October 2007 Seminar by referencing statements made at a March 2007 Seminar.[2]  Plaintiffs' new allegations elaborate upon allegations made in the original Complaint, in particular, that the AU seminar included information about technical aspects of annuities, annuity regulations, and common misunderstandings about annuities and annuity contracts. Plaintiffs allege that the statements contained in the preview to the broadcast or the broadcast itself are "false characterizations."

---

[2]  The Court recognizes Plaintiffs have not been afforded an opportunity through discovery to obtain a copy of Defendants' camera footage of the October 2007 Seminar statements.  However, the Amended Complaint quotes Clark's statements from the March 2007 Seminar.  Plaintiffs allege the statements from the March 2007 Seminar are substantially the same statements Clark would have made in the October 2007 Seminar and provide the true context of Clark's October statements featured in Defendants' Report.  For purposes of this Order, the Court assumes that the statements made in the March 2007 Seminar are substantially the same as those made in the October 2007 Seminar.  (Doc. # 39, ¶ 65.)

The Court considers each statement in turn:

1.      Statement # 1.

In the first minutes of the program, the host made the following introductory

statement:

> Hansen:  Join us in a ground-breaking hidden-camera investigation, as we
> go behind the scenes to uncover the techniques they use: inside sales
> meetings – where we catch the questionable pitches; inside training
> sessions– where we discover agents being taught to scare seniors; and
> finally, inside seniors' homes to reveal the tricks some agents use to puff
> their credentials to make a sale.

(Doc. # 39, ¶ 73.)

Plaintiffs contend that Statement # 1 as presented in the context of the Report is

defamatory because it implies that Clark teaches insurance agents to scare seniors

when selling annuities.  (Doc. # 39, ¶ 74.)  They explain that Clark does not teach

"scare tactics," rather, he addresses a legitimate and important aspect of financial

management for seniors.  (Doc. # 39, ¶ 75.)  Plaintiffs explain that Clark instructs

insurance agents how to identify potentially frightening or disturbing issues to determine

the "suitability of insurance products."  (*Id.*)

Defendants, on the other hand, assert that Plaintiffs fail to offer any factual

allegations to support their assertions that Clark does not teach scare tactics.

Thus, Defendants argue Plaintiffs have failed to show a lack of substantial truth.

 Clark admits that he tells attendees of his seminars that he raises issues with

potential purchasers that "disturb the hell out of them" and that he "brings out the stuff

that–where they can't sleep at night."  (Doc. # 39, ¶ 88.)  Clark also teaches insurance

agents that the value they "bring to the table is when you disturb them; when you uncover problems that are lurking in their mind." (Doc. # 39, ¶ 90.) Given Plaintiffs' own words, the Court finds that the gist of the characterization of the seminar as teaching "scare" tactics is substantially true. The Court finds that Plaintiffs fail to sufficiently plead facts demonstrating the falsity of Defendants' Report with respect to Statement # 1.

2.     Statement # 2

Plaintiffs next note the following *Dateline* voiceovers:

Hansen:  We've seen some of the tactics insurance agents use to sell seniors.  The agents seem awfully slick.  How did they get so good?  You are about to witness something few people have ever seen – a school where, authorities say, insurance salesman are being taught questionable tools of the trade.

3.     Statement # 3

Hansen:  These training sessions are only open to licensed insurance agents. We don't know whether these salesman we've met so far studied here, but the State of Alabama agreed to help us investigate by issuing insurance licenses to two Dateline producers, so we could attend – and bring along our hidden cameras.

(Doc. # 39, ¶¶ 78-79.)

Plaintiffs claim that Statement # 2 implies a link between the salesmen shown at the sting house in Alabama and AU and that Statement # 3 omits details of an alleged collusion between *Dateline* and ALDOI. (Doc. # 39, ¶¶ 76-79.) However, Plaintiffs' allegations ignore the express disclaimer in Statement # 3 that *Dateline* did not know whether these salesman had attended AU.

9

With regard to Statement # 3, because Defendants merely observed a fact, namely that the State of Alabama agreed to help with their investigation, the statement is substantially true.  Plaintiffs allege *Dateline* should have explained the details of the alleged collusion with the State of Alabama, but such an omission, the Court notes, does not render the statement false or defamatory.  Accordingly, the Court finds that Plaintiffs fail to sufficiently plead facts demonstrating the falsity of Defendants' Report with respect to Statement ## 2 and 3.

4.      Statement # 4

Plaintiffs next note the following *Dateline* voiceover, combined with hidden camera footage of Clark:

> (Hidden Camera).  Clark: Annuities are not liquid?  That is baloney.

> Hansen:  This is the man in charge of 'Annuity University' –Tyrone Clark, the self proclaimed king of annuity sales.  Annuities are legitimate investments for some people, and Clark is a strong advocate for them.  He says they're safe and have no risk, which are selling points especially appealing to seniors.

> (Hidden camera).  Clark:  What I sell is peace of mind . . . .

(Doc. # 39, ¶¶ 80-82.)

Plaintiffs allege that Clark's own statements from the March 2007 Seminar are not a sales technique based on deception and scare tactics.  Plaintiffs assert that Clark explains that annuities shift the risks of short term economic volatility from the annuity owner to the insurance company; annuities are not subject to volatility risks in various investment options; and consumers who do not want to risk their money should go to a

10

safer environment.  (Doc. # 39, ¶¶ 83-84.)  Plaintiffs do not dispute that Clark stated that

he sells "peace of mind."  (*Id.*, ¶ 84.)  Accordingly, under the doctrine of "substantial

truth," the Court finds that the gist of Dateline's characterization that Clark associates

"peace of mind" with lack of risk in his sales seminar is substantially true.

     5.    Statement # 5

Plaintiffs next address the following description in the *Dateline* program of a

Massachusetts investigation against Plaintiffs:

> Hansen:  But what else is Tyrone Clark teaching?  In 2002, the State of
> Massachusetts accused Clark and his companies of a 'dishonest scheme
> to deceive, coerce and frighten the elderly.'  Part of the evidence was the
> training manual in which Clark tells agents to sell to seniors by assuming
> they're selling to a 12-year-old' and by hitting their 'fear, anger or greed
> buttons.'  Clark settled that case without admitting any wrongdoing.  And,
> now, his company says it's become 'an industry leader' in promoting
> ethical conduct.  But watch what our hidden cameras found, and see if you
> agree.  Remember those scare tactics?

(*Id.*, ¶ 86.)

With respect to Statement # 5, Plaintiffs allege that *Dateline* fails to explain that

Massachusetts did not prove those allegations and that it rapidly terminated its claim by

settlement.  (*Id.*, ¶¶ 86-87.)  The Court notes that *Dateline* expressly acknowledges the

settlement without admission of wrongdoing.  As such, the Court finds Statement # 5 to

be substantially true.

     6.    Statement # 6

Plaintiffs next point to the hidden camera comments by Clark, which were

combined with Dateline's own commentary:

(Hidden Camera).  Clark: And I am bringing these things up that disturb the hell out of them.

Hansen:  For Tyrone Clark, disturbing people seems to be Annuity Sales 101.

Clark:  I bring out the stuff that – where they can't sleep at night.

(Doc. # 39, ¶ 88.)

Plaintiffs contend Clark's statements are defamatory because they were displayed out of context.  Plaintiffs contend that the context supplied by *Dateline* meant and was understood by those watching the Report to mean that Clark teaches scare tactics.  (*Id.*, ¶ 89.)  They explain that Clark does not mislead seniors into purchasing annuities by means of scare tactics.  Rather, Clark's statements from the March 2007 Seminar describe how a "good agent" makes prospective clients aware of problems by uncovering issues they will regard as important but have not considered, or have not realized.  (*Id.*, ¶ 90.)

Defendants assert that Plaintiffs' allegations confirm that Clark's goal is to teach agents scare tactics and, thus, the Report with regard to this statement is substantially true.  (Doc. # 49 at 32.)  As discussed above with regard to Statement # 1, Clark admits that he raises issues that "disturb the hell out of them," and that he "bring[s] out the stuff that – where they can't sleep at night."  (Doc. # 39, ¶ 88.)  Clark also urges his attendees to prey on the concerns seniors may have about losing their money to nursing homes.  Clark states, "[t]he value you bring to the table is when you disturb them; when you uncover problems that are lurking in their mind."  (*Id.*, ¶ 90.)

12

Accordingly, the Court finds the gist of the characterization in Statement # 6 that Clark

teaches "scare tactics" to be substantially true.

      7.     Statement # 7

      The next allegedly defamatory statement cited by Plaintiffs is a *Dateline*

voiceover, followed by another clip of Clark:

> Hansen:  And how do you make them worry?  One way is to suggest their money may not be safe, even in a bank, by telling a potential client something like this.

> Clark:  FDIC is insolvent.  FDIC only has $1.37 per every $100 on deposit.

(Doc. # 39, ¶ 92.)

      Plaintiffs allege this is defamatory because "[a]t no point in his discussion of bank

accounts and FDIC insurance did Clark instruct attendees to state that their customer's

'money may not be safe even in a bank.'" (*Id.*, ¶ 94.)  Plaintiffs explain that Clark's

words about the FDIC were merely an observation on the state of the federal insurance

deposit fund and were meant to contrast the reserve requirements of the FDIC.  (*Id.*,

¶ 99.)  In support of their allegations, Plaintiffs offer statements made by the chairman

of the FDIC in March 2009, and a Wall Street Journal report about the solvency of the

FDIC.  (*Id.*, ¶ 95.)

      Defendants assert that Plaintiffs offer no new allegations that alter the plain

meaning of Clark's statement that the FDIC is insolvent.  (Doc. # 49 at 33.)

      The Court finds the statements offered by Plaintiffs relay facts about the impact

of the financial crisis on the FDIC, and do not alter the substantial truth of *Dateline's*

Report.  The *Dateline* Report shows that Clark questions the solvency of banks by stating the FDIC is insolvent.  Furthermore, Clark instructs agents to contrast the solvency of banks and the FDIC to the security of the insurance industry in order to raise doubts in seniors' minds about whether their money is safe in a bank.  (Doc. # 39, ¶ 96.)  Thus, the gist of the characterization of Statement # 7 is substantially true.

    8.    Statement # 8

The next statement cited by Plaintiffs is another *Dateline* voiceover followed by a clip of Clark:

> Hansen:  Another way is to mention a senior's natural fear of nursing homes.

> (Hidden Camera).  Clark: I help my clients to protect their life savings from the nursing home and Medicaid seizure of their assets.  See, that is scary, and it should be scary.

(*Id.*, ¶ 100.)

Plaintiffs contend that Statement # 8 is defamatory because Clark does not teach agents to prey on seniors' "natural fear of nursing homes."  Plaintiffs explain that Clark discusses the financial implications of nursing homes, a discussion which helps seniors effectively plan their finances.  (*Id.*, ¶¶ 102-103.)  They contend that mere mentioning of senior financial planning cannot be considered a "scare tactic" and, thus, this statement is defamatory.  (*Id.*)

Defendants assert that the allegations do not render false the statement in the Report that Clark "mentions senior's natural fear of nursing homes."  The Court agrees.

Clark expressly states that the loss of life savings and Medicaid seizures are "scary"

and "should be scary."  Accordingly, the Court finds Statement # 8 is substantially true.

     9.     Statement # 9

Plaintiffs next reference a series of voiceover and hidden camera combination

clips featuring Clark and Attorney General Lori Swanson:

> Hansen:  The next step?  Promise people easy access to their money.
> Even though, with some exceptions, annuities lock up most of your money
> for a specified number of years, listen to the sales pitch Tyrone Clark
> suggests . . . .

> (Hidden Camera).  Clark:  There are more ways to access your money.
> There are more options.  There are more choices to access your money
> from an annuity than any other financial instrument.

     10.     Statement # 10

> Hansen:  We ask Minnesota Attorney General Lori Swanson to watch
> what our hidden cameras had captured.

> Hansen:  How would you characterize what this man has said?

> Lori Swanson:  I think that he is not telling the truth when he tells those
> agents that an annuity is the most liquid place a senior citizen can put their
> money.  It is simply not true.

(Doc. # 39, ¶¶ 105-106.)

Plaintiffs advance four theories regarding how these statements were

defamatory.  First, Plaintiffs allege the statements made by *Dateline* and Attorney

General Swanson are false and taken out of context with Clark's statement.  (*Id.*,

¶¶ 105-107.)  Second, Plaintiffs allege that *Dateline* does not explain how much of the

hidden camera footage Attorney General Swanson had watched.  (*Id.*, ¶ 106.)  Third,

they allege that Clark does not actually say that an annuity is "the most liquid place a senior citizen can put their money." (Doc. # 39, ¶ 107.) Fourth, they allege that Clark advises attendees that annuities are not a proper financial strategy for people who want to routinely withdraw funds. (*Id.*, ¶108.)

Plaintiffs assert that Clark meant that annuity products are not a proper financial strategy for people who want continual access to their funds, that a bank or a money market would be a more suitable place to hold funds, and that funds in annuities have more options for accessing money than other financial instruments. (*Id.*, ¶ 110.)

Defendants argue Plaintiffs' explanation does not alter the plain meaning of Clark's statement that there are more choices to access money from an annuity than from any other financial instrument. (Doc. # 49 at 36.) Clark's statement from the March 2007 Seminar, "when it truly comes to liquidity options take any other financial instrument . . . . we have more ways to access the money than any other financial instrument," supports Attorney General Swanson's statements that Clark tells insurance agents that an annuity is the most liquid place a senior can put their money. (Doc. # 39, ¶ 109.) Like *Dateline's* other characterizations of Clark's own words, the Court finds the characterization of Statement ## 9 & 10 to be substantially true.

11.     Statement # 11

Plaintiffs next reference a segment of the Report describing a book titled "Alligator Proofing Your Estate" marketed at AU:

> Hansen:  At Annuity University, this ad says you can be the author of a book called 'Alligator Proofing Your Estate.'  Apparently, agents like the

16

> idea of pretending to be authors, because *Dateline* found copies of the same 'Alligator' book supposedly co-written by Jeffrey D. Lazarus, Steven Delott, and Ronald and Robert Russell.

(Doc. # 39, ¶ 111.)

Plaintiffs allege this statement is defamatory because at no point do insurance agents pretend to be authors of the "Alligator book." (*Id.* at ¶ 111.)  Plaintiffs explain that an agent did, in fact, author a personal chapter of the book, while the rest of the book's chapters were written by an expert.  (*Id.*)  They also contend that Clark does not teach attendees of the AU seminar to represent themselves as authors of portions of books they have not written.  (*Id.* at ¶ 113.)  Rather, Plaintiffs contend that Clark instructs agents to build their credibility by "joining organizations, speaking in churches and writing articles" and that they "start their own late-night radio broadcast discussing financial planning to further establish local credibility." (*Id.*)

However, it is undisputed that Defendants correctly identified several agents listed separately as co-authors of the same book.  Thus, the Court finds the gist of Statement # 11 to be substantially true.

    12.    The Preview

Plaintiffs next point to two statements made in the preview to *Dateline's* Report, which was aired on NBC's *Today Show.*  First, Plaintiffs' argue the *Dateline* voiceover, "Are some agents being coached on how to mislead people when they sell annuities?" was defamatory.  (Doc. # 39, ¶¶ 67.)  The voiceover aired while showing images of Clark speaking at the October 2007 Seminar.  (*Id.*)

Plaintiffs allege this is defamatory because Clark does not teach insurance agents at the seminars scare tactics; rather, he teaches insurance agents how to be honest with prospective clients.  (Doc. # 39, ¶¶ 69-70.)  Plaintiffs explain that a central theme at Clark's seminars is that insurance agents should always be honest with prospective clients because honesty attracts customers and establishes trust.  (*Id.*)

However, as discussed above, given many of the statements Clark undisputedly made at the October 2007 Seminar and the March 2007 Seminar, the Court finds that the rhetorical question posed by *Dateline*, to the extent it suggests Clark coaches agents how to mislead people, is substantially true.

Second, Plaintiffs contend that the preview displayed a picture of the "Alligator Proofing Your Estate" book, in which the voiceover claimed the book was marketed at AU, and claimed that, for a fee, a salesman could be listed as the exclusive author of the ghost-written book.  (*Id.*, ¶ 71.)

They allege this is defamatory because the edition of the book displayed has not been marketed at AU for more than five years, was co-authored by a named qualified estate planning expert along with an agent, and is not "ghost written."  (*Id.*)

The Court finds that the way the book is presented, as conveyed in the *Dateline* preview, suggests that insurance agents had much more involvement than they actually had in writing the book.  The Court concludes the gist of the preview's characterization of the book as a marketing device that misleadingly bolsters an agent's credibility is substantially true.

In sum, the Court finds that Plaintiffs have failed to meet their burden to plead facts, rather than conclusions, that show that the *Dateline* Report placed the at-issue excerpts in a false light.

**B.     CLAIM FOR VIOLATION OF 42 U.S.C. § 1983**

Plaintiffs also allege their constitutional rights were violated and seek damages pursuant to 42 U.S.C. § 1983.[3]  Plaintiffs allege Defendants, acting under the "color of state law" by virtue of their alleged interactions with the State of Alabama, violated Plaintiffs' rights under the Fourth and Fourteenth Amendments to the Constitution, including a violation of their right to be free from unreasonable search and seizures, invasion of their right to privacy and a claim for stigmatization.  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) the deprivation of rights by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible and; (2) the party charged with the deprivation must be a person who may fairly be said to be a state actor. *Johnson v. Rodriguez,* 293 F.3d 1196, 1202 (10th Cir. 2002) (quoting *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937 (1982)).

Although Defendants are private parties, Plaintiffs contend the facts of this case support a finding that Defendants were state actors.  In order to find that a private party

---

[3]  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.

is a "state actor" for purposes of invoking the application of 42 U.S.C. § 1983, the facts must indicate that "the state is responsible for the specific conduct of which the plaintiff complains" and substantial involvement between the state and private officials in carrying out the deprivation of plaintiff's constitutional rights.  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295 (2001); *Berger v. Hanlon,* 129 F.3d 505 (9th Cir. 1997), *vacated and remanded by*, 526 U.S. 808 (1999), *judgment reinstated by* 188 F.3d 1155 (9th Cir.1999).

A media entity will not be considered a state actor unless there are sufficient facts to demonstrate joint action and a shared purpose between state authorities and the media entity.  *Anderson v. Suiters,* 499 F.3d 1228, 1234 (10th Cir. 2007).  In *Anderson,* the plaintiff filed a § 1983 action against a television reporter, a company owned television station, and a police officer (the "media defendants") for violation of her constitutional right to privacy.  The plaintiff alleged her estranged husband raped and videotaped her while she was unconscious.  *Id.* at 1231.  The plaintiff gave the videotape to a police officer with the agreement that the tape would remain confidential and be used only for law enforcement purposes.  *Id.*  The police officer then authorized the media defendants to record and display the videotape's contents on the air, solely for the purposes of showing a "head shot" of the husband.  The plaintiff alleged that the police officer called her on the telephone, on behalf of the media defendants, to encourage her to speak with the media defendants.  *Id.*  The police officer then put the television reporter on the telephone to speak with the plaintiff.  The plaintiff further

alleged that the media defendants then aired more of the videotape than originally authorized by the police officer.  *Id.* at 1233.  She alleged a working relationship between the media defendants and the police officer, such that the media defendants were state actors.

The Tenth Circuit rejected the plaintiff's argument that the media defendants were state actors.  *Id.*  The court held that the plaintiff failed to show facts that demonstrated a shared purpose by the police officer and the media defendants that violated plaintiff's constitutional rights.  *Id.*  In evaluating the complaint, the court stated that "[a]t most, the parties had their own separate goals: [the police officer] wanted to appear on camera, and the media defendants wanted exclusive access to the investigation."  *Id.*  It further noted that, according to the complaint, the television station, and not the police officer "retained editorial control over the use of the videotape."  *Id.*

In the instant case, Plaintiffs assert that the best evidence demonstrating joint action under the "color of state law" between the Defendants and the State of Alabama is the actual agreements signed by Eckert, Amorebieta and ALDOI.  (Doc. # 61 at 28.) The signed agreements demonstrate that Eckert and Amorbieta received insurance licenses from the State of Alabama for the purposes of an investigation with clear instruction that the licenses be returned at the conclusion of the investigation.  (Doc. # 39-4.)  Plaintiffs allege that the State of Alabama sponsored the Defendants' unlawful actions in a series of coordinated activity.  (Doc. # 39, ¶¶ 131-132.)  They also allege Leon Capuano, an Alabama attorney, posed as a potential customer at the Alabama

sting house and was a social acquaintance of Joseph Borg, Director of the ASC. (*Id.*, ¶ 52.)  Plaintiffs allege Joseph Borg's recommendation that Leon Capuano pose as "a volunteer" at the Alabama sting house further supports their claim of unlawful state action.  (*Id.*)

Although it is undisputed that, without the insurance licenses issued to Defendants by ALDOI, Defendants would not have been allowed to attend the October 2007 Seminar, it is also undisputed that Alabama state officers did not attend or record the October 2007 Seminar.  The written agreements do not show a joint relationship between the State of Alabama and the Defendants.  In fact, the written agreements between Eckert and Amorbieta and ALDOI consist of only the following two sentences:

> [Defendant] has received a Producer License from the State Department of Insurance to be used solely for the purpose of an investigation.  It is the understanding and agreement of [Defendant] that [he/she] will immediately relinquish this license when the investigation is concluded.

(Doc. # 39-4.)

The purported relationship between Capuano and Borg does not demonstrate that state officials were involved in the production of the Report.  Similar to the defendants in *Anderson,* the Defendants in the instant case and ALDOI had "their own separate goals":  *Dateline's* goal was to obtain footage for use in its Report and Alabama authorities hoped to learn more about predatory practices toward seniors.  (Doc. # 39, ¶¶ 47-51.)  Moreover, Plaintiffs do not allege that the Alabama authorities had editorial control over the use of the material recorded by Defendants at the October 2007 Seminar or that it had any authority over the content aired in *Dateline's* Report.

22

Even assuming the truth of Plaintiff's allegations, the Alabama authorities and *Dateline* did not engage in behavior that would be considered to be joint action in the production and airing of the Report.  Further, there is no allegation that the Defendants did anything at the command of the Alabama authorities that they would not have done in the ordinary course of their own reporting.  *Cf.*, *Berger v. Hanlon*, 129 F.3d 505 (9th Cir. 1997), *vacated and remanded by*, 526 U.S. 808 (1999), *judgment reinstated by* 188 F.3d 1155 (9th Cir.1999) (media defendants were "state actors" when they participated with federal officers in the execution of a search warrant "and executed the search in a manner designed to enhance its entertainment, rather that its law enforcement value." Government officers also had control over the extent of footage the media defendants broadcasted and the officers were "joint participants" in shaping the contents of defendant's broadcast.); and *Frederick v. The Biography Channel,* 683 F.Supp. 2d 798, 801 (N.D. Ill. 2010) (media film crew had a formal contractual agreement linking the media defendants to the city.  City's police department took a proactive role in ensuring plaintiff was made available to a film crew during and after her arrest.)  The Court finds that Plaintiffs have failed to allege sufficient facts showing state action on the part of these private party Defendants.

Plaintiffs have failed to allege facts demonstrating that the State of Alabama and Defendants were joint participants in creating the broadcast Report.  The issuance of insurance licenses by the State of Alabama which enabled Defendants to gain access

into the October 2007 Seminar is insufficient proof to sustain a claim of state action, pursuant to 42 U.S.C. § 1983, against these non-governmental defendants.

## C. WHETHER THE COURT SHOULD DISMISS WITH OR WITHOUT PREJUDICE

To summarize, then, Plaintiffs' Amended Complaint fails to state plausible claims under Federal Rule of Civil Procedure 12(b)(6). Accordingly, it must be dismissed. The question is whether to dismiss with or without prejudice. Given the extensive allegations in the Amended Complaint, the Court finds it would be futile to allow Plaintiffs another opportunity to plead claims of either defamation or violation of § 1983. Another complaint, for example, would not alter the Court's conclusion that the statements contained in the Report are substantially true. Accordingly, the Court finds it appropriate to dismiss with prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.") (citing *Grossman v. Novell*, Inc., 120 F.3d 1112, 1126 (10th Cir. 1997)).

## V. CONCLUSION

The Court finds that Defendants' broadcast was substantially true and, thus, was not a defamatory portrayal of the at-issue statements. Thus, Plaintiffs' defamation claim fails. Plaintiffs' § 1983 claim fails because they have not adequately alleged that Defendants were state actors. Accordingly, it is ORDERED that:

- Defendants' Motion to Dismiss Amended Complaint (Doc. # 49) is GRANTED.

- This case is DISMISSED WITH PREJUDICE.

DATED:  January __11__, 2011

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge