**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 09-cv-00717-CMA-BNB

BROKERS' CHOICE OF AMERICA, INC., and
TYRONE M. CLARK,

      Plaintiffs,

v.

NBC UNIVERSAL, INC.,
GENERAL ELECTRIC CO.,
CHRIS HANSEN,
STEVEN FOX ECKERT, and
MARIE THERESA AMOREBIETA,

      Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE AMENDED
COMPLAINT**

---

In 2007, two NBC reporters secretly attended and videotaped "Annuity

University" (AU), a two-day seminar for licensed insurance brokers.  AU was hosted by

Plaintiff Brokers' Choice of America, Inc. (BCA), and its founder and CEO, Plaintiff

Tyrone M. Clark (Clark).  NBC then selected portions of this undercover footage and

included it in a portion of an episode of its television show *Dateline,* entitled "Tricks of

the Trade," concerning the questionable practices employed by insurance salesmen to

sell annuities to senior citizens.  Plaintiffs allege that this *Dateline* broadcast was

defamatory because NBC's viewers would believe that Mr. Clark taught AU attendees to

employ scare tactics to sell inappropriate annuity products to senior citizens – when, in

fact, the seminar advocated that its attendees employ a more nuanced approach,

teaching salesmen to determine whether an annuity is the right investment for a

particular client, emphasizing the downsides of annuities, and advocating ethical

practices.  This matter is before the Court on Defendant's Motion to Dismiss, or, In the

Alternative, for Summary Judgment.  (Doc. # 111.)

## I.  BACKGROUND

The factual background of this lawsuit – including an extensive summary of the

*Dateline* program at issue – is set forth in detail in the Tenth Circuit's opinion, *Brokers'*

*Choice of Am., Inc.*, 757 F.3d 1125, 1131-1134 (10th Cir. 2014), and will not be

reiterated in full here, but is incorporated by reference.  However, a brief description of

this matter's current procedural posture is necessary for resolution of the instant Motion.

In 2014, the Tenth Circuit affirmed in part and reversed in part this Court's prior

decision dismissing this case in its entirety.  Specifically, the Tenth Circuit affirmed the

Court's dismissal of Plaintiff's claims under 42 U.S.C. § 1983, but reversed its

determination that Plaintiffs failed to state a defamation claim because the "gist" of the

*Dateline* program at issue here was "substantially true."  *Brokers' Choice of America,*

*Inc. v. NBC Universal, Inc.,* 757 F.3d at 1138, 1149 (10th Cir. 2014.)  In so doing, the

Tenth Circuit held that this Court erred in analyzing each of Clark's statements

"individually" and in deciding "with respect to each, whether or not it was substantially

true," rather than employing a "global approach" that examined the "totality of the

circumstances" and considered the *Dateline* statements in the "Tricks of the Trade"

broadcast and the recordings of the two-day seminar in their entirety.[1]  *Id.*  It also

---

[1] The Court notes that in outlining this "global approach" and the "totality of the circumstances"
standard, the Tenth Circuit cited two cases: one from the Second Circuit, applying New York

explained that if the case ultimately proceeded to trial,

> the aired statements would necessarily be considered as a whole and in the context of all that was said by the narrator and guests in the *Dateline* segment discussing Clark's seminar.  Then the aired segment would necessarily be compared to the entirety of Clark's seminar presentation.  If that comparison were to clearly and convincingly show the aired statements to have left viewers with a false impression of the gist of Clark's seminars . . . he has been defamed by *Dateline*, otherwise he has not.

*Id.*

The Tenth Circuit described the "gist" of the *Dateline* program as being "quite simple" and distilled it as follows: "Clark teaches insurance agents to scare and mislead seniors into buying unsuitable insurance products."  *Brokers' Choice of Am., Inc.*, 757 F.3d at 1138.[2]  Plaintiffs allege that this "gist" was false, because Clark's seminar, when considered in its entirety and without *Dateline*'s selective editing and framing, "**teach[es] and encourage[s] ethical conduct by presenting a balanced approach** to saving and investing, and, while touting the advantages of annuities, **emphasize[s]**

---

state law (*Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 114 (2d Cir. 2005)), and one from the Colorado Supreme Court (*Burns*, 659 P.2d at 1360).  *Brokers' Choice of Am., Inc.*, 757 F.3d at 1138.  *Burns,* however, dealt with a somewhat distinct area of defamation law from that of "substantial truth."  Specifically, the Tenth Circuit quoted *Burns* for the proposition that, in examining whether a statement is defamatory, "the entire published statement must be examined in context, not just the objectionable word or phrase statement."  *Id.*  This quotation, however, appears in *Burns* in a discussion of how the examination of context is necessary in determining whether a particular statement constitutes a protected opinion rather than an assertion of fact, because "[i]t would not be possible for us to establish a hard and fast rule which could govern every situation."  *Burns*, 659 P.2d at 1360.

[2] Plaintiffs described the "gist" of the broadcast in a similar fashion, alleging that the broadcast was "understood by viewers to mean that Plaintiffs had instructed insurance agents on how to frighten and mislead senior citizens into purchasing unsuitable insurance products, had derided the dignity and intelligence of senior citizens, and that Plaintiffs taught misleading, abusive and fraudulent sales techniques to insurance agents in Alabama and across America."  (Doc. # 39, ¶ 126.)

**that they are not right for everyone**." *Brokers' Choice of Am.*, 757 F.3d at 1131

(emphasis added).  Specifically, Plaintiffs allege that:

> [T]he unedited footage would show Clark teaching the downside of
> annuities, urging his students to probe into the customer's personal
> situation to determine the most suitable product, repeatedly telling
> students annuities are not for everyone, stressing BCA's code of ethics
> which require full disclosure of various advantages and disadvantages of
> annuity products, and promoting personal involvement in the community to
> gain credibility.

*Id.* at 1139.

Accordingly, to decide whether Plaintiffs alleged sufficient facts to demonstrate a

plausible claim for defamation, the Court must determine whether the allegations

Plaintiffs made in their Complaint – i.e., that Mr. Clark's actual seminar advocated that

his attendees utilize a more nuanced and ethical sales approach when selling annuities

to prospective senior clients than that portrayed by *Dateline* in the "Tricks of the Trade"

broadcast – are, in fact, borne out by the entirety of the hidden camera footage.  This

footage was not considered when the Court was resolving Defendants' Motion to

Dismiss, nor available to the Tenth Circuit in its review of the Court's Order granting the

Motion to Dismiss, as the full recordings were deemed to be statutorily protected by the

Court under Colorado's Journalist Shield Law, C.R.S. § 13–90–119(3).  Because the

Tenth Circuit also reversed that portion of the Court's decision, the entirety of the hidden

camera footage is now before the Court in the form of DVDs and undisputed

transcripts.[3]  (Doc. ## 112, 130-3 and -4.)

---

[3] Plaintiffs assert that this Court essentially has no choice but to deny Defendant's Motion to
Dismiss on the same basis as the Tenth Circuit, "since nothing at all has changed in this case"
since that decision was made.  (Doc. # 130 at 24.)  This argument, however, fails to account for
the fact that the Court now has the unedited, hidden camera footage before it – i.e., it has the

## II.  ANALYSIS

### A.  LEGAL STANDARDS

### 1.  CONVERSION TO SUMMARY JUDGMENT

Defendants filed the instant Motion to Dismiss alternatively as one for summary judgment; Plaintiffs argue that the Court should deny this instant Motion under Rule 12(g) of the Federal Rules of Civil Procedure, because it is Defendant's second motion to dismiss.  Accordingly, as a preliminary matter, the Court must decide whether resolution of the instant Motion is proper and also whether to convert the Motion to one of summary judgment.

Rule 12(g)(2) provides that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  Although Plaintiffs assert that the outtakes were "available" in support of their prior Motion to Dismiss, but that Defendants "chose to withhold production in favor of fighting an ultimately losing battle on a privilege claim" (Doc. # 130 at 26), this stretches the definition of "available" beyond the breaking point.  Defendants had a good-faith argument that the statutory privilege applied, and any use of the outtakes in the prior Motion would have effectively waived it.  As such, the arguments made herein were not actually "available" – nor was the required comparison

---

necessary comparator – against which it can determine, pursuant to the Tenth Circuit's instructions, whether the gist of *Dateline*'s broadcast was substantially true.  *See Brokers' Choice of Am.*, 757 F.3d 1125 at 1139 (explaining the required comparison and that, in support of its allegations of falsity, "BCA alleged the unedited footage **would show** Clark teaching the downside of annuities . . . .")  Plaintiffs also contend that the Tenth Circuit "precluded [Defendant's arguments in support of its Motion to Dismiss] in favor of a trial on the merits." (Doc. # 130 at 24.)  The Tenth Circuit, however, clearly stated that a "**judge** or a properly instructed jury could view the *Dateline* segment as aired, compare it to what Clark said over the course of his two-day seminar and decide whether the aired program gave a false impression of his seminar."  *Brokers' Choice of Am.*, 757 F.3d 1125 at 1132 (emphasis added).

actually possible before the outtakes were made available to the Court. Although the Court has been unable to find a case in which a successive Motion to Dismiss was brought after a good-faith privilege claim was reversed on appeal, Rule 12(g) is not implicated by these very unique circumstances and the denial of the Motion on such hyper-technical grounds is not warranted.

Resolution of this case requires two interrelated steps: 1) a comparison between *Dateline*'s portrayal of what occurred at Tyrone Clark's two-day "Annuity University" seminar and the full, unedited footage showing what actually occurred in that seminar, and 2) a determination of whether *Dateline*'s portrayal was "substantially true" to the entire seminar, or if it left a false impression of what actually occurred in the mind of the average *Dateline* viewer. *See Brokers' Choice of Am.*, 757 F.3d at 1132 ("The judge or a properly instructed jury could view the *Dateline* segment as aired, compare it to what Clark said over the course of his two-day seminar and decide whether the aired program gave a false impression of his seminar; in other words, whether the segment was not substantially true.") Because the outtakes were both central to Plaintiffs' defamation claim and, given the law to be applied in this situation, independently sufficient, in and of themselves, to test the sufficiency of the Complaint, the Court need not convert the instant Motion to one of summary judgment. Indeed, Plaintiffs specifically "reserved" Exhibit A to their Amended Complaint for the hidden camera footage, and also asserted that "[t]he falsity of the context supplied by Defendants and uttered by Hansen . . . will be . . . demonstrated by Clark's actual context recorded by Defendants' hidden cameras when entered on the record as Exhibit A to this Amended Complaint." (Doc. # 39, ¶ 127.) The "raw footage" from these hidden camera

6

recordings (which the Court will sometimes refer as "the outtakes") has been

transcribed by court reporters, and neither party disputes the accuracy of these

transcripts.  As such, the Court considers the transcripts and compares them to the

*Dateline* broadcast; as a matter of law, no more evidence is needed to test the

sufficiency of the defamation claim, and conversion to summary judgment is not

required.

2.    **MOTION TO DISMISS**

"'The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence

that the parties might present at trial, but to assess whether the plaintiff's amended

complaint alone is legally sufficient to state a claim for which relief may be granted.'"

*Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (quoting *Miller v. Glanz*, 948

F.2d 1562, 1565 (10th Cir. 1991)).  In deciding such a motion, "[a]ll well-pled factual

allegations are accepted as true and viewed in the light most favorable to the

nonmoving party."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 550 (2007) (citations, quotation marks, and alterations omitted).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to

raise the right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

3.     **DEFAMATION**

Because this claim arises under diversity jurisdiction, the Court applies Colorado

substantive law in determining whether Plaintiffs have stated a defamation claim.  *See*

*Haberman v. The Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006) ("In diversity

cases, the substantive law of the forum state governs the analysis of the underlying

claims.")  To state a cause of action for defamation under Colorado law, a plaintiff must

allege "(1) a defamatory statement concerning another; (2) published to a third party; (3)

with fault amounting to at least negligence on the part of the publisher; and (4) either

actionability of the statement irrespective of special damages or the existence of special

damages to the plaintiff caused by the publication."  *Williams v. Dist. Ct., Second*

*Judicial Dist.*, 866 P.2d 908, 911 n. 4 (Colo. 1993).  This case turns on the first element.

Where, as here, a defamation claim involves a public figure or a matter of public

concern, it triggers certain constitutional privileges.  *Smiley's Too, Inc. v. Denver Post*

*Corp.*, 935 P.2d 39, 41 (Colo. App. 1996).  In such cases, the United States Supreme

Court has recognized that there are competing interests between the protection of

reputation and the press's ability to engage in "uninhibited, robust, and wide open

debate" on critical public issues.  *Id.* (citing *New York Times Co. v. Sullivan*, 376 U.S.

254 (1964)).  Accordingly, the news media's reporting of a matter of public or general

concern is protected, unless the alleged defamatory statements are published with

actual malice, that is, published with actual knowledge that they were false or in

reckless disregard of their truth.  *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1361

(Colo. 1983) (citing *Sullivan*, 376 U.S. 254).  Actual malice can be shown if the

defendant entertained serious doubts as to the truth of the statement or acted with a

high degree of awareness of its probable falsity. *Lewis v. McGraw–Hill Broad. Co.*, 832 P.2d 1118, 1123 (Colo. App. 1992). A Plaintiff must prove actual malice by "clear and convincing evidence," that is, evidence "'which is stronger than a 'preponderance of the evidence' and which is unmistakable and free from serious or substantial doubt.'" *DiLeo v. Koltnow*, 613 P.2d 318, 323 (Colo. 1980) (quoting Colorado Jury Instructions (2d ed.) § 3:2).

Additionally, substantial truth is an absolute defense to a defamation claim in Colorado; as such, even if a statement is defamatory, it is not actionable as a matter of law if it is "substantially" true. *Fry v. Lee*, 2013 COA 100, ¶ 22 (citing *Gordon v. Boyles*, 99 P.3d 75, 81 (Colo. App. 2004)). "Substantial" truth is not the same as "absolute" or "literal" truth and "[a] defendant asserting truth as a defense in a libel action is not required to justify every word of the alleged defamatory matter." *Gomba v. McLaughlin*, 504 P.2d 337, 339 (Colo. 1972) (explaining that requiring a defendant to prove literal or absolute truth would be unnecessarily strict and contrary to common sense); *see also Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) (with regard to the determination of substantial truth: "in defamation law, as in life, determinations of fact and fiction are not zero-sum."). Rather, the Court's inquiry focuses on whether "the substance, the gist, the sting" of the statements was true. *Gomba,* 504 P.2d at 339. A plaintiff is also required to prove that the substance, gist, or sting was false by clear and convincing evidence. *Fry*, 2013 COA 100, ¶ 21 (noting that in cases involving public issues, the heightened clear-and-convincing burden applies). "The question, a factual one, is whether there is a **substantial difference between the allegedly libelous statement and the truth**," that is, "whether the statement produces a different effect upon the

9

reader than that which would be produced by the literal truth of the matter." *Id.* (emphasis added).

A publisher may be liable when it takes words out of context and uses them to convey a false representation of fact. *Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977); *see also TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1196 (10th Cir. 2007) (applying Colorado law) (noting that a statement may be defamatory "because it omits a relevant material fact . . . and therefore carries a defamatory implication.")  As such, although statements may appear to be true when viewed in isolation, the Court considers the "context of the entire story and the common meaning of the words utilized" to determine if a false impression has been created in the mind of an average viewer, "including the medium through which it is disseminated and the audience to whom it is directed."  *See Burns v. McGraw–Hill Broad. Co.*, 659 P.2d 1351, 1360 (Colo. 1983).  The ultimate question is whether a version of the publication that "included the omitted facts," i.e., the "literal truth of the matter," would have produced a different effect on a viewer than the version that was actually published.  *Fry*, 2013 COA at ¶ 23; *see also TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1197 (10th Cir. 2007) (applying Colorado law, internal citation omitted) (noting that a statement was substantially true because "the omission of what the plaintiff considered to be relevant information would not convert an otherwise nonactionable statement into a defamatory one"); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991) (noting that "an exact quotation out of context can distort meaning, although the speaker did use each reported word," but that "[i]f an author . . . effects no material change in

meaning, including any meaning conveyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation.")

Finally, "[w]hen 'underlying facts as to the gist or sting are undisputed, substantial truth may be determined as a matter of law.'" *Brokers' Choice*, 757 F.3d at 1137 (citing *Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 360 (8th Cir. 1996)); *see also Gordon*, 99 P.3d at 81(holding that statement was "substantially true" as a matter of law because the plaintiff's "amended testimony neither suggests an alternative interpretation of the contents of the arrest record nor challenges its authenticity.  As a result, in light of this unambiguous documentary evidence, we conclude that no issue of material fact exists in regard to the truth of the statements.")  Because the threat of protracted litigation could have a chilling effect on the constitutionally protected right of free speech, prompt resolution of defamation actions, either by motion to dismiss or summary judgment, is appropriate.  *Barnett*, *Barnett v. Denver Publ'g Co.*, 36 P.3d 145, 147 (Colo. App. 2001)   Specifically, a motion to dismiss can be granted on the basis that the challenged publication was substantially true.  *Fry*, 2013 COA, ¶ 24; *see also Barnett,* 36 P.3d at 147 (affirming trial court's dismissal of a defamation claim where challenged statement's substantial truth was clear from plaintiff's complaint); *C.G. v. City of Fort Lupton*, No. 13-CV-01053-REB-CBS, 2014 WL 2597165, at *14-15 (D. Colo. June 10, 2014) (dismissing defamation claim on a 12(b)(6) motion where substantial truth was clear from the face of the complaint).

## B.   <u>APPLICATION</u>

The Court has completed the global, "totality of the circumstances" analysis mandated by the Tenth Circuit, by reviewing the outtakes in their entirety and comparing

them to the entirety of the *Dateline* broadcast.  This global comparison between the broadcast and the outtakes reveals that the unedited footage does not, in fact, shore up the rosy picture of the seminar painted by Plaintiff's Amended Complaint.  Rather, the outtakes show that, after making promises of extremely handsome paydays from sales commissions, Mr. Clark superficially discussed common criticisms of annuities – **not** to assist his attendees in conducting even-handed and objective determinations of their prospects' portfolios in an effort to find the best financial products for their clients, but rather, to provide his attendees with ready responses about how such criticisms were, in Mr. Clark's words, "baloney," in order to allow them to make a sale.  The seminar also advocated that attendees use scare tactics in making sales and that the agents bolster their reputations with potential clients in less-than-transparent ways.  Although Plaintiffs attempt to rely on some of Mr. Clark's vague references to the importance of telling the "truth" and "caring" about clients, when the hidden-camera footage of the two-day seminar is considered as a whole, the "gist" of *Dateline*'s portrayal of what Mr. Clark presented at the seminar still substantially mirrored what, in fact, Mr. Clark presented at the seminar.  As such, Plaintiffs cannot show, as a matter of law, that viewing the broadcast (as opposed seeing the entire seminar) "would have a different effect on the mind of the reader from that which the pleaded truth would have produced" – much less make this showing with clear and convincing evidence.  *See Air Wis. Airlines Corp. v. Hoeper,* 134 S. Ct. 852, 861 (2014).

Prior to its discussion of whether the "gist" of the *Dateline* broadcast materially differed from the full seminar, the Court notes that it is critical to bear in mind the overall context in which Mr. Clark's words were uttered and also to whom they were uttered.

Even though the seminar was entitled "Annuity University," Mr. Clark was not offering a dry, educational seminar for, say, financial advisers, who wished to learn about annuities (vis-à-vis other financial products) for the purposes of educating their clients about them.  Instead, they were uttered at a **sales seminar**, **to individuals who had paid Mr. Clark to learn about how to sell annuities successfully**.  Clark himself introduced his seminar by saying, "you're here essentially to make money; is that true? I mean, you want to do better, make more money," (Doc. # 130-3 at 4), and "[y]ou didn't come out here to learn about annuity products but you will learn some.  You came out here to learn how to sell annuities, how to run your business and so forth," (Doc. # 130-3 at 7).  The following is a sampling of some of the other statements Clark made throughout the two-day seminar, which demonstrate the extent to which he "primed" the AU attendees to think about their own financial self-interest by repeatedly emphasizing the handsome sales commissions they stood to make – but only if they were able to "unlock" the senior marketplace for annuities:[4]

> **But I have trained more millionaires in the annuity industry than anybody in America**. There is no other individual.  By the way, I know all the top producers.  Most of them, I started them, and I trained them, or I did their seminars.  **I made more millionaires in this business than anybody.**  Now, the reason I'm saying that to you is what I say here today is either true or it's not.  Okay? There is nothing in between.  **And so if there's anybody in the annuity industry that can teach you, help you or guide you to become a multi-multimillionaire** – and I'm not saying become a millionaire because I'm greedy or you're greedy. **I'm just saying that's that – you're here essentially to make money; is that true?**  I mean, you want to do better, make more money.  (Doc. # 130-3 at 4) (emphasis added).

---

[4] "This [seminar] is your home to build your wealth.  There's not a better industry, not a better opportunity anywhere, none.  What you need is to unlock this marketplace."  (Doc. # 139-4 at 89.)

And I heard one gentleman here say that you're doing 10 million and you want to get to 20.  With – with where the – the – where the demographics of our society is going, **where the changes are taking place, it's not going to be uncommon for agents to write 30 to a hundred million in premium. We had a gentleman here last month who wrote over a hundred million of premium**.[5]  A hundred million.  (*Id.* at 4-5) (emphasis added).

**How am I going to, how am I going to turn you into a multi-millionaire, megamillion-dollar producer**? . . . What comes from this is conviction.  See, the gentleman here who said that they write $10 million, to get that person to $20 and $30 and $40 million, and to **get you folks up to $10 million, it's going to start coming from what I'm showing you now.  If you have conviction, you have passion.**  And if you have conviction, you're going to have passion, but then you are on a mission.  **You're on a mission.  And if you're on a mission, nothing can stop you.**  (*Id.* at 14) (emphasis added).

See, the gentleman here who said they're writing 10 million, to get that person to 20 and 30 and 40 million**, to get you folks up to 10 million**, it's going to start coming from what I'm showing you now.  (*Id.* at 15) (emphasis added).

CLARK: If somebody gives you a hundred grand [in an annuity sale] and you make 7%, 8% [in commissions], you make $7,000 or $8,000 in probably two or three hours.  What if you had three people a week that do that?  How much is that? $300,000 times seven?  See?  Anybody here?
MALE VOICE: $21,000.
CLARK: What if you did that four times a month?  How much is that?
MALE VOICE: $84,000.
CLARK: You see what I'm saying?
MALE VOICE: Million dollar a year.
CLARK: **Million-dollar-a-year income business.**  (*Id.* at 18) (emphasis added).

**That's – that's the way it seems in our society today.  And it seems like if you're making really good money, you've got to be doing something wrong, or they want to get it from you, or they're jealous of you.  That – that's what has happened in our society, unfortunately.**  And what I'm saying is this: **You have the right to be outrageously successful.**  Now, I want you to think about that, because I

---

[5] Clark notes elsewhere that the agents typically earn 7-9% in sales commissions and that such commissions are calculated from premiums.  (Doc. # 130-3 at 18, 199-200.)

really believe that people, they put this deep, deep, deep thing in their subconscious where they can't make a lot of money.  And -- **and I'm telling you this: If you want to get to 30, 40 million of premium, you want to get to 10 million, the limitations that exist are the ones that are in your brain.**  (*Id.* at 19) (emphasis added).

And I'll tell you a quick story. I was giving this school one time, I think it was Philadelphia, and there was a gentleman, he couldn't speak English very well.  And -- and I used to write everything down -- okay? -- tear off -- tear off the pages, and I'd hang them up all over the room.   And I'm telling you the truth.  This guy 3 took all the pages and put them in a big bundle like this, and he took them home.  **And I saw him about six years later, and he memorized all of it – and this is a true story –  and he became a millionaire from what he learned that I gave him.**  Another gentleman that works with John Naylor's group named Fred Hackney -- Fred Hackney came to see me, **and he knew word for word my presentations.  And he got tapes from another gentleman and memorized those tapes. He said, Tyrone, I owe this to you, all the money I've been making**, because I memorized those tapes. (*Id.* at 174-75) (emphasis added).

So what I don't understand is this: **Why aren't you writing millions and millions in premiums?  It's not the market. It's not the prospect. It's not the product.  It's you. You**. Because you still don't believe in yourself.  And that is a fact. You still don't believe because you have not -- you have not applied yourself.  (*Id.* at 184) (emphasis added).

MR. CLARK?  You know what I love about your partner Bruce (unintelligible)?  He's a long-term care salesman.  And – and learning something new takes a while to really try to get a grip on it.  You know, you got to put it in your own personality, your own language.  But this year, what do you think he'll write?
UNIDENTIFIED MALE SPEAKER: Wow, 8 or 9 million.
MR. CLARK: 8 or 9 million dollars. This is his second year. . . . Okay.  So let's say – what's 8 percent of 9 million?
UNIDENTIFIED MALE SPEAKER:  720.
MR. CLARK:  How much?
UNIDENTIFIED FEMALE SPEAKER:  720,000.
MR. CLARK:  $720,000.  **Folks, in the annuity business, you only need -- you only need a couple of good years, and you set yourself up for the rest of your life.**  (*Id.* at 199-200) (emphasis added).

So if you guys really want -- listen, **there's no excuse as to why you're not wealthy.  There's no excuse for you not being wealthy**. There really isn't.  Everybody develops -- develops at a different pace.  I've had

agents that, boy, all of a sudden they're 10, 20 million.  Like Nick
(unintelligible), he was a doctor.  The second year he was on pace for
almost 25 million of premium.  Year number two.  I've had other agents
after eight or nine years they get up to 10 or 15 million.  (Doc. # 139-4 at
199) (emphasis added).

I'll teach you and train you how to sell 10 annuities, and **you'll make
hundreds of thousands, if not millions, of dollars**.  (Doc. # 130-4 at
136) (emphasis added).

See, you guys are, like . . . **you're inches, inches, inches 4 away --
inches away from accomplishing this and writing 10-million-a-year
premium**.  You have to believe that.  And then you have to start saying, I
can do it, I can to be it, I can do it.  And you can do it.  (*Id.* at 106)
(emphasis added).

Now -- see, the seminar -- I had to experiment and do 993 seminars in 49
states just to make sure it's going to be good for you.  Okay?  That's the
fact.  **It's a masterpiece.  The seminar has produced about eight
billion in sales.**  That's a real number.  **So the seminar works like a
machine.  Works like a machine.**  (*Id.* at 151-52) (emphasis added).

As the statements themselves reveal, Mr. Clark was not merely advocating that

his broker-attendees provide disinterested, objective information about annuities to

potential clients; rather, **he was selling his own sales techniques** by repeatedly

emphasizing how much the attendees stood to financially benefit if they, in turn,

**successfully** employed his techniques and **sold annuities to seniors**.

## THE GIST OF THE SEMINAR: CLARK'S "SCARE TACTICS"

In its analysis of the "substantial truth" of the *Dateline* broadcast, the Tenth

Circuit stated the following regarding *Dateline*'s assertion that Mr. Clark advocated the

use of "scare tactics" in selling annuities:

The judge determined *Dateline*'s statements were substantially true given
Clark's statements on the program, including he "disturbs" his potential
customers to the point "where they can't sleep at night."  The judge further
stated, "Clark also urges his attendees to prey on the concerns seniors

may have about losing their money to nursing homes" and causes seniors to fear about the security of their money deposited with banks.

. . .

Clark cannot, and does not, deny the accuracy of the words attributed to him in the *Dateline* segment.  In his own words, he brings "out stuff that – where they can't sleep at night" and "I help my clients to protect their life savings from the nursing home and Medicare seizure of their assets.  See, that's scary, and it should be scary."  **Semantic differences between "disturb" and "scare tactics" cannot defeat Clark's unambiguous statement – "That's fear. The presentation should have that impact."**

**However, the program not only accused Clark of using scare tactics. The "gist" or "sting" was his calculated use of these tactics to sell inappropriate products to seniors.**

*Brokers' Choice of Am.*, 757 F.3d at 1138 (internal citations omitted, emphasis added).

However, particularly given the procedural posture of this case, it is not entirely clear whether the above statement – "semantic differences cannot defeat Clark's unambigious statement" – was merely an observation or whether it constituted a holding.[6]  In any case, the Tenth Circuit also explained how Clark's use of "scare tactics" is inextricably linked with the overall "gist" or "sting" of the program ("the program not only accused Clark of using scare tactics.  The 'gist' or 'sting' was his calculated use of these tactics to sell inappropriate products to seniors.")  As such, the

---

[6] Not surprisingly, the parties themselves disagree about the legal effect of the Tenth Circuit's analysis.  Defendants argue that the "court itself **found as a matter of law** that the broadcast's characterization of plaintiffs' scare tactics was substantially true, based on Clark's own words." (Doc. # 111 at 18) (emphasis added).  In contrast, Plaintiffs argue that "the Tenth Circuit did not reject any allegation in the Amended Complaint as not well-pled, nor did it make any finding of fact about the truth or falsity of the broadcast on the fact issue of 'scare tactics' or any others," and characterize the Defendants' reading of the Tenth Circuit's decision as a "tortured rendition of [its] actual holding." (Doc.  # 130 at 29, 29 n. 132.)

Court conducts its own analysis regarding the "substantial truth" of the assertion that Mr. Clark employed "scare tactics."

Plaintiffs argue that *Dateline*'s portrayal of the seminar was substantially false because an attendee at the full AU seminar would have believed that, rather than teaching attendees to "scare" potential clients, Mr. Clark "addressed legitimate (albeit difficult to talk about and often disturbing) aspects of financial planning for seniors, including Medicaid spend down, nursing homes, fluctuating markets, world events, and ill-spent inheritances."   (Doc. # 130 at 7.)  However, Clark's own statements reveal that he did not advocate that his attendees merely "address" the legitimate but disturbing concerns of seniors in an effort to determine the best financial product for them; rather, he was forthright in advocating that his agents take a very active role in "uncover[ing]" and "discover[ing]" a potential client's "emotionally based problem" – especially one that "disturb[ed] the hell out of" the client to the point where "they can't sleep at night" – and that he also advocated that the attendees would "solve" that same "problem" **by selling the client an annuity**.  Specifically, Clark told his attendees:

> When I -- when I talk to agents I say, what's going on?  What happened on this case?  I always hear mumbo jumbo, mumbo jumbo. I say, wait a second, you forgot something.  I say, Jeff, **where's the problem**? **Where's the client's problem?  Okay.  And if that's not an emotionally based problem, you have no sale.**  There is not going to be a sale.  **You uncover and you discover problems.  That's what we do. And then we solve those problems**. . . . **My seminar is bringing forth** as a -- in as articulate manner as possible, based on the way they think and the way they say **their problems, and then I have empathy, and then I relate to every one of my audiences.  Okay?  And I bring these things out that disturb the hell out of them**.  That's what I do in my workshop. Not by putting -- or making them so fearful.  **I bring out the stuff when they can't sleep at night.**

(Doc. # 130-3 at 76) (emphasis added).  Similarly, he told AU attendees that "[t]he

content of the seminar [for potential customers] is powerful, **and it's disturbing**.

They've already made the decision – that's so important – **they've already made the**

**decision that they need me in the workshop because I bring up stuff that is very**

**disturbing**," and that "**If you really want to strike at the heart of a prospect**, ask

them if they have children that intend to spend their money as soon as they get it.  And

there's nothing that they want more is to know -- to know that their children will be

financially secure when they're no longer here.  **They'll buy an annuity just for this**

**feature, just for this benefit.  Nothing else**."  (Doc. # 130-3 at 152, 156-57) (emphasis

added).  He also told the following story about how he "impacts" prospective senior

clients "emotionally" by raising the prospect of a "son-in-law [who] has turned into the

outlaw-in-law" and who takes "half of the inheritance" (assuming, of course, the client

doesn't buy an annuity for protection from such an outcome):

> **I say, folks, 78 percent of the assets that is [sic] inherited by the**
> **Baby Boom generation will spend those assets within nine months.**
> **So what took you a lifetime to build, when it gets in their hands, it's**
> **gone, the majority of it, within nine months**.  **You hear the room just**
> **chatter, chatter, chatter, chatter.  I impacted them emotionally.**  I say,
> folks, what's worst of all is this: If I wrote a check right now for $50,000
> and I handed that to your son or daughter, how long would that last?  You
> hear them all talking, what do you think, honey, 30 minutes, a few days?  **I**
> **say, well, folks, you're doing exactly that.  You're just dumping it**
> **right in their lap.  And worst of all, it's going to go into their marital**
> **accounts, and your son or daughter have a 50 percent chance of**
> **their marriage ending in divorce.  And you hear them -- now I've**
> **really got them going.  Now, that son-in-law has turned into the**
> **outlaw in-law, and he divorces your daughter, he's able to walk away**
> **with half of the inheritance**.  He marries someone else that has children
> of her own.  So guess who ultimately ends up with those assets?  The
> new spouse's children.  Wouldn't you like to meet these kids?  You know, if
> they're going to end up with – with what took you a lifetime to build, all
> those 40 years of work are going to end up in some stranger's children's

> hands – how did that happen?  How did that happen?  **Have I affected them?  Big time.**

(Doc. # 130-3 at 33) (emphasis added).  Clark also explicitly told his attendees

that their presentations to potential clients should affect potential clients

emotionally and have a "fearful" impact, and how an additional way of doing this

would be to raise the specter of "family conflict, divorce, and bankruptcy":

> See, listen to me, listen, you guys, **the limitations that exist are the ones that are in your mind.**  Your audience at the end of your presentation, it should be like they're competing with one another for an appointment with you.  That's what it should be like.  It should be like the best movie that they've ever seen, that one-and-a-half-hour presentation was like a great movie. **And -- and they're emotionally affected.**
>
> . . .
>
> It's kind of like this: **If the doctor said, you know, I'm sorry, you have cancer.  You need to -- you need to come to the office as soon as you can.  Man, you're going to be there.  That's fear. The presentation should have that impact.  It should have that impact.**
>
> **I got some stuff so powerful, so powerful, because I'll say, you know what, ladies and gentlemen, how would you feel if you knew that you were the cause of family conflict, divorce, and bankruptcy in your family, and you caused it?**  How would you feel about that?  Probably miserable.  Can that happen? It can happen in the manner that you leave your assets to your children.  It wasn't your intention, but the way you leave assets to your kids could end up in a grudge with your children. **I've seen families never talk to each other for years because of the way their parents have left the assets to them.  That disturbs the heck out of them.**
>
> **See, you guys are, like -- you know, Jim, you've been doing some -- you're inches, inches, inches away -- inches away from accomplishing this and writing 10-million-a-year premium.  You have to believe that.**

(Doc. # 130-4 at 103-05) (emphasis added).

As the above-quoted statements make clear, Plaintiff's allegation that "nowhere in . . . the two days of lectures does Clark speak of misleading senior citizens into annuities purchases by means of fabricated fears and scare tactics" (Doc. # 39, ¶ 89), rings particularly hollow upon comparison with the outtakes.  In fact, Mr. Clark repeatedly advocated that his attendees affect potential clients on an "emotional" level, give presentations that leave them feeling afraid, "uncover and . . . discover" problems that "disturb the hell out of" them, and "strike at the[ir] heart" – and that he also specifically connected this tactic with making sales ("if that's not an emotionally based problem, you have no sale.  There is not going to be a sale") and commissions ("you guys are, like . . . you're inches, inches, inches away -- inches away from accomplishing this and writing 10-million-a-year premium.")  As such, *Dateline*'s portrayal of his seminar as advocating the use of "scare tactics" in selling annuities to seniors was, in fact, substantially true.

## THE GIST OF THE SEMINAR: THE SUITABILITY OF ANNUITIES

The first interview subject of *Dateline*'s broadcast was Leo Stulen, a senior who had purchased an equity-indexed annuity with his life's savings, purportedly without being told that "he would pay stiff surrender penalties" if he needed to withdraw his money early.  (Doc. # 10-3 at 2.)  Stulen spoke about how his wife became ill and how, in withdrawing his money early from the annuity, he was required to pay a 15% surrender fee – which meant both that "[h]e got less money [out] than he put in" and that he was forced to sell his home and to choose between buying food and medicine.  (*Id.*)  Following Stulen's interview, the voiceover states that Stulen was "not the only senior who's heard the pitch," and that

> *Dateline* is about to show how some insurance agents can take advantage of you.  **Join us for a ground-breaking hidden-camera investigation, as we go behind the scenes to uncover the techniques they use**: inside sales meetings – where we catch the questionable pitches; **inside training sessions – where we discover agents being taught to scare seniors**; and, finally, inside senior[s'] homes to reveal the tricks some agents use to puff their credentials to make a sale.  You're about to see what happens when we catch them in the act.

(*Id.* at 3) (emphasis added).  After showing undercover footage of an "informational seminar" for retirees, the broadcast moves to footage of a "sting house" in Alabama, where *Dateline* secretly filmed local insurance agents using questionable tactics to sell annuity products to individuals recruited by *Dateline*, including by failing to disclose the existence and size of early withdrawal penalties.  (*Id.* at 3-6.)  The narrator then notes that "[e]xperts say putting your life savings in indexed annuities can be a bad deal for seniors, because they lock up most of your money for years.  And if you need your cash early, you pay surrender penalties so big that you can wind up with less money than you put in."  (*Id.* at 6.)  Reporter Chris Hansen next introduces the segment specifically featuring "Annuity University" by stating that

> We've seen some of the tactics insurance agents use to sell to seniors.  The agents seem awfully slick.  How did they get so good?  You are about to witness something few people have ever seen – **a school where,** authorities say, **insurance salesmen are being taught questionable tools of the trade.  These training sessions are only open to licensed insurance agents.  We don't know whether the salesmen we've met so far studied here,**[7] but the state of Alabama agreed to help us investigate by issuing insurance licenses to two *Dateline* producers, so we could attend – and bring along our hidden cameras.

---

[7] The Court notes that in making this comment, *Dateline* is effectively differentiating between the different parts of the Broadcast and affirmatively signaling to viewers that the footage of the brokers who they saw at earlier points in the broadcast were not likely to be ones associated with BCA or Mr. Clark.

(*Id.* at 7.)  Thereafter, the program cuts to footage of Clark stating "[a]nnuities are not

liquid?  That is baloney."  (*Id.* at 7.)  Hansen then introduces Clark as the "the man in

charge of 'Annuity University' . . . the self-proclaimed king of annuity sales" and states

that **"[A]nnuities are legitimate investments for some people, and Clark is a strong**

**advocate of them.**  He says they're **safe and have no risk**, which are selling points

especially appealing to seniors."  (*Id.* at 7-8.)  The show immediately cuts to undercover

footage of Clark, stating "What I sell is peace of mind."  (*Id.* at 8.)[8]

After discussing how Clark teaches attendees to use "scare tactics," including

"suggest[ing] [seniors'] money may not be safe, even in a bank," and "mention[ing] a

senior's natural fear of nursing homes," (*id.* at 8), the voiceover notes that "[e]ven

though, with some exceptions, annuities lock up most of your money for a specified

number of years, listen to the sales pitch Tyrone Clark suggests."  (*Id.* at 8-9.)  It then

---

[8] Plaintiffs' Amended Complaint characterizes this portion of the Broadcast as defamatory and
asserts that "at no point . . . did Clark say that annuities 'have no risk.'"  (Doc. # 39, ¶ 81.)  The
outtakes, however, clearly show otherwise:

- "So when it comes to annuities -- okay? -- annuities are number one. When it comes
  to safety, liquidity, tax advantages, **competitive returns without risk**, probate
  avoidance, simplicity, flexibility, exchangeability, (unintelligible)."  (Doc. # 130-3 at
  11) (emphasis added).
- "The reason I'm getting to this -- okay? -- is the products are real.  They're the real
  deal.  The real deal.  **Not one of my customers have lost a dollar**."  (*Id.* at 33.)
- "Competitive returns **without risk.  Without risk**."  (*Id.* at 66) (emphasis added).
- So liquidity?  Yes.  **Good returns without risk?  Yes**.  (*Id.* at 73-74) (emphasis
  added).
- **"[Y]ou're keeping the investment in a risk-adverse place**.  I mean, if you
  deposited money in a trust and put it in a risky investment, we don't know if the
  money is going to be here.  **In an annuity, we know it's always going to be there**."
  (*Id.* at 158) (emphasis added).
- "Nothing can stack up to the safety, the liquidity, the tax advantages, **the returns
  without risk**, the probate avoidance and the nursing home protection.  Just take any
  – take a bank CD. It doesn't have all those. Take any of those other investments."
  (*Id.* at 196) (emphasis added).

quotes Mr. Clark as saying: "There are more ways to access your money. There are

more options.  There are more choices to access your money from an annuity than any

other financial instrument." (*Id.* at 9.)  The show then moves to footage of an interview

with Lori Swanson, Minnesota's Attorney General, wherein Hansen asks Swanson how

she would "characterize" Clark's comments about accessing money in an annuity, and

she responds: "I think that he is not telling the truth when he tells those agents that an

annuity is the most liquid place a senior can put their money.  It is simply not true." (*Id.*

at 10.)

In contrast, with respect to the suitability of annuities, Plaintiffs alleged that

*Dateline*'s portrayal of the AU seminar is false because the full seminar's outtakes

"would show" Clark:

> teaching the downside of annuities, urging his students to probe into the
> customer's personal situation to determine the most suitable product,
> repeatedly telling students annuities are not for everyone, stressing BCA's
> code of ethics which require full disclosure of various advantages and
> disadvantages of annuity products, and promoting personal involvement in
> the community to gain credibility.

*Brokers' Choice of Am., Inc.*, 757 F.3d at 1139.  Plaintiffs also alleged that:

> To aid them with suitability issues, agents . . . are **taught a list of twenty
> potential negative aspects of annuities[] that can be used in
> determining whether an annuity is a suitable product for a potential
> client**.  Items on the list, among others, include (1) surrender charges, (2)
> tax considerations, (3) absence of FDIC insurance for annuities, (4) fees,
> loads and charges, and (5) risks that Medicaid planning may not work.
> Agents also have to know how to address criticisms of annuities, often
> false, used by those who sell competitive products, such as mutual funds,
> stocks, bank certificates of deposit and money market accounts.

> Clark's typical presentation about banks and the FDIC compares the
> reserve holding requirements of insurance companies to those of banks
> and includes the observation that if a bank's reserve holding were
> evaluated based on the same reserve holding requirements as insurance

> companies, the bank would likely be considered insolvent. . . . . In this vein, Clark also typically teaches agents to advise clients not to keep more than FDIC guarantee limits in a single bank and often distributes a USA Today article explaining the risks of having a single bank hold funds in excess of FDIC guarantees.
>
> . . . [According to the Amended Complaint,] Clark explained various types of penalty waivers and access to interest in different types of annuities as a prelude to his statement: "take any other financial instrument, a treasury bill, a mutual fund, you name it, we have more ways to access the money than any other financial instrument."

*Id.*

Mr. Clark's statements from the outtakes reveal, however, that his seminar did not, as the Complaint alleges, "teach" or discuss the downsides of annuities in any substantive fashion, nor did it instruct AU attendees to "**probe** into the customer's personal situation **to determine** the most suitable product."  At no point in the entire seminar does Mr. Clark give attendees advice about how to **assess** whether an annuity is the "most suitable" investment vehicle for a particular client's unique financial situation.  Instead, against a backdrop in which he consistently reminds attendees about the very handsome commissions they will make if they successfully sell these products, the entirety of the outtakes clearly show that Mr. Clark (and, by extension, his attendees) **already assumed** that an annuity was the "most suitable" product for the senior client. [9]  Accordingly, as the outtakes reveal, the overriding concern of his

---

[9] Indeed, Clark tells his attendees that **the only other product** which is "safer, [has] more liquidity options, better tax advantages, returns without risk, and . . . avoids probate" is life insurance, but that older Americans may not be good candidates for life insurance: "when it comes to older Americans -- okay? -- they have health problems.  So now you have mortality charges, and they have to qualify for it.  And then you have all kinds of issues in regards to the qualification. And they have to have the need.  **That leaves the second-best product there is. It's annuities**."  (Doc. # 130-3 at 12 (emphasis added).  (*See also* id. at 10) ("I sell safety, security, certainty. What my competitors sell is volatility, speculation, okay? They sell risk."); (*id.*

presentation was closing the sale, and Mr. Clark merely offered the common anti-

annuity arguments as straw men to be knocked down in the course of that sale.  Indeed,

he admits that he is offering the criticisms in a "setup" to "build [the annuities back] up":

"I'm going to break down the products, and then I'm going to do something that you

probably didn't expect, I'm going to attack annuities in a setup to destroy the annuities.

Okay?  And then we're going to build them up and go from there."  (Doc. # 130-3 at 41.)

His attitude towards the suitability (and criticisms) of annuities and the objections of

potential clients is evidenced in the following statement:

> So what I don't understand is this: Why aren't you writing millions and
> millions in premiums?  It's not the market.  It's not the prospect.  **It's not
> the product.  It's you.  You.  Because you still don't believe in
> yourself.** And that is a fact. . . . You have not applied yourself. And let me
> prove it to you.  What you just gave me, Chris, you just gave an objection.
> Okay?  **I have a client, he said this. Right?  There is a zillion -- zillion
> objections, but is the client selling you and you're buying it?  Who's
> selling who?  Are you selling the client, or is the client selling you? .
> . .** So how do you articulate appropriately and discuss that issue with that
> person?  So when you know the safety or liquidity, the tax advantages, the
> safe and secure compounding guaranteed on a tax advantage basis, with
> the ability (unintelligible) [of an annuity], then who is selling who?  **But
> why are you buying the story from the prospect?  You're letting them
> do that because you don't believe in yourself.  You don't believe in
> yourself because you take the tact that, Mr. Prospect, then sell me;
> tell me why this is not good for me**.

(*Id.* at 185-86.)

Plaintiffs allege, for example, that Mr. Clark "taught" the AU attendees about the

downsides of annuities by "discussing" surrender charges – one of the problematic

at 66) ("I want you to memorize the six features of an annuity: The safety, liquidity, tax
advantages, competitive returns without risk, probate avoidance, and you can still structure the
annuity to protect the asset from a nursing home spend out, nursing home benefits.  We're
going to walk you through all of that as well. Okay? Now, there are a few states where you
cannot use an annuity for Medicaid planning. You could replace that with, um, no market risk, if
you want.")

aspects of annuities prominently featured on the *Dateline* program.  However, the

outtakes reveal that, in fact, Mr. Clark's "discussion" of such charges indicates that he

did not take them seriously nor did he teach his attendees how to determine whether an

annuity would be the right product for a particular client **in spite of those charges** (by,

for example, providing attendees with some idea of how help their clients to weigh the

risk of potential surrender charges in light of the client's other investments or financial

resources, or even disclosing what those surrender charges might be).  Instead, Mr.

Clark merely mentioned that there "are some high surrender charges," (a criticism he

immediately proceeded to dismiss out of hand as being invalid and not "real world"), and

the only lesson he provides is one about how the attendees could deflect the criticism to

move on to the sale.  Indeed, he went so far as to "spin" such charges as positive

attributes of annuities, and he also advocated that his trainees engage in some creative

accounting that could "eliminate the impact" of the surrender charge by adding a

"bonus":

> **If there is a criticism of annuities, this is it [referencing a Powerpoint slide containing 20 criticisms of annuities].**  This is the laundry list of annuities, negative laundry list.  So what I'm saying to you—not because I'm here to say annuities are the greatest thing in the world—**is this true and is it valid?  Is it true? Is it valid?  Let's start with surrender charges.  Is that a valid criticism?  There are some high surrender charges; however**, **what did I say about surrender charges**? . . .  You don't put your money in to take it out, put it in, take it out.  Surrender charges enables higher rate of return.  It deters people trying to take the money from the client.  It's an incentive to take advantage of tax deferments, and most all other investments have some kind of a penalty or surrender charge.  But it does decline, it disappears, and I can -- I can eliminate the impact of a surrender charge by virtue of adding the bonus.  If I add an interest bonus on the first year, I just eliminated the impact of the surrender charge. And then if I calculate the penalty -- let's go out four years from now, or let's add a bonus or whatever. So I don't know if that -- **I don't think that that's a valid criticism**. Let me tell you why: The real

> world -- did you ever see that -- the TV show The Real World? Reality
> show. They -- they should have one real world when it comes to finances.
> **In the real world, they never touch their money.  Seniors put their
> money in annuities, I'm sorry, but they never touch it.  They never
> take it out**.

(*Id.* at 186-87) (emphasis added).

Another similar example of this tendency –Mr. Clark acknowledging a criticism or

downside of annuities on a very superficial level, dismissing it (as "baloney," "garbage,"

and "not true"), and teaching his agents how to dodge it in order to close the sale – is

Mr. Clark's discussion of the common criticism that annuities are not a "liquid" form of

investment:

> There are more ways to access your money.   There are more options.
> **There are more choices to access your money from an annuity than
> any other financial instrument**.  No other investment or savings vehicle
> in existence gives you the number of options of accessibility that you have
> with an annuity.  **Annuities are not liquid. That is baloney, that's
> garbage, that is not true.**  Up to 10 percent withdrawal.  The monthly
> interest, I have eight standard options of annuitization.  I have hospital
> waiver, nursing home waiver, terminal illness waiver, cash waiver upon
> death.  Most annuities I can borrow from, and many annuities have check-
> writing access, (unintelligible) Southwest has your credit card accessibility.
> **There are more ways to access your money than any other financial
> instrument. So liquidity?  Yes.**  Good returns without risk?  Yes.

(*Id.* at 73-74) (emphasis added).  Although Plaintiffs argue that "Clark **explained**

**various types of penalty waivers and access to interest in different types of**

**annuities** as a prelude to his statement: 'take any other financial instrument, a treasury

bill, a mutual fund, you name it, we have more ways to access the money than any

other financial instrument,'" *Brokers' Choice of Am., Inc.*, 757 F.3d at 1139, this portion

of the outtakes show that, in fact, Mr. Clark does no such explaining – for example, he

does not provide a single scrap of detail about penalty waivers and access to interest,

including their limitations (for example, he does not explain how long an individual would need to be in the hospital for the hospital waiver to be a realistic option), or the costs of these options vis-à-vis other financial instruments.

Mr. Clark's discussion of the lack of FDIC insurance for annuities also conforms to this pattern. He did not provide a balanced and nuanced discussion of the advantages and disadvantages of such insurance, or how it might affect the suitability of an annuity as an investment vehicle for a particular client within their individual investment portfolio. Instead, he merely mentioned the lack of insurance and provided his attendees with a ready response – a response that, far from taking the criticism seriously, turned it into a virtue:

> There is not FDIC insurance. **Thank goodness it's not FDIC insured because the FDIC is insolvent**. The FDIC only has a dollar 30 cents for every hundred dollars deposited. Did you know that? You can order their annual report. Look at the last page. I can talk a lot about that.

(*Id.* at 190.)[10] Mr. Clark's "discussion" of tax penalties is similarly superficial and essentially assumes that such penalties are never a problem – as is his

---

[10] Plaintiffs' Complaint alleges that the broadcast was defamatory in part because of its reference to Mr. Clark's discussion of the FDIC; specifically, after Chris Hansen states, "And how do you make [seniors] worry? One way is to suggest their money may not be safe, even in a bank, by telling a potential client something like this," *Dateline* quoted Mr. Clark as saying "FDIC is insolvent. FDIC only has $1.37 per every $100 on deposit." Plaintiffs contend that "[t]he context supplied by Hansen meant and was understood by those watching the . . . broadcast to mean that Clark teaches insurance agents to make potential clients worry that their money may not be safe in banks." (Doc. # 39, ¶¶ 92-93.) In contrast, Plaintiffs asserts that Mr. Clark merely offered an "observation on the state of the federal insurance fund" and that "taken within the larger context of the two day lectures, the observation was meant to contrast the reserve requirements of the FDIC with the 'five pillars' protecting life insurance funds. **Nothing Clark said supports Hanson's [sic] assertion that he teaches students to scare seniors into believing that banking funds are not safe.**" (*Id.*, ¶ 99) (emphasis added). However, Clark's own words belie this assertion and specifically show how, in fact, he stated outright that

"discussion" of fees, loads and charges, and risks that Medicaid planning may

not work.  (*Id.* at 193) (emphasis added) ("Okay.  Current tax policy, that's only if

you're under 59 1/2 and you take the money out.  **Most of my clients are all**

**older**.  **And I don't sell them to a young person who will take the money**

**out.**"); (*Id.* at 193) (emphasis added) ("Medicaid planning will not work. **That's**

**not true.** That's by virtue of whether or not you know what you're doing, what

product you're selling."); (*Id.* at 192) (emphasis added) ("And the annuities I sell

have no fees, no lows [sic], no charges.  **So that's not valid with all annuities**.")

Additionally, although Plaintiff alleges that Clark "repeatedly [told his] students

[that] annuities are not for everyone," the Court has reviewed both of the parties'

briefing, as well as the entire transcript of the two-day seminar, and it has been able to

locate exactly **two** instances in which Mr. Clark acknowledged an annuity might not be a

money may not be as safe in a bank as in an annuity:

> **[M]y clients are from the same generation as yours, and what they're
> concerned about is the issue of safety because you come from the Great
> Depression.** And during the Great Depression -- you remember from your
> parents that they lost money during the Great Depression.  **Oh, but today we
> have the FDIC.  However,  the FDIC only has a dollar and 37 cents for every
> hundred dollars on deposit.** Well, what about the reserves?  Well, when it
> comes to reserves, **the banks only hold in reserve 5 to 10 percent of your
> deposit.  So no wonder why there are still concerns from your generation
> about safety. . . .** So let me show you what a lot of my clients have done about
> their certificates of disappointment.  They transferred their CDs into what is called
> a guaranteed-return annuity account.  Why?  **When it comes to safety, these
> have a much stronger history of safety and are much stronger than banks
> because when it comes to the Great Depression, no one lost their money
> during the Great Depression with a guaranteed-return annuity account.**
> And when it comes to the FDIC, the financial institution where this money is, has
> (file skipped) 5 dollars for every hundred dollars on deposit. Big difference versus
> a dollar and 37 cents.  And when it comes to reserves, they have 100 percent
> plus in reserves because they don't lend the money out like the banks do.  **So
> when it comes to safety (file skipped), is much safer.**

(Doc. 130-4 at 154) (emphasis added).

suitable product.  In both instances, however, he effectively minimizes these statements by also stating that the factors which make an annuity problematic **do not apply to seniors** – and, critically, the "gist" of *Dateline*'s program is that Mr. Clark taught his attendees problematic tactics to **target seniors specifically,** not consumers more generally.  First, Mr. Clark stated, in the context of a discussion about surrender charges:

> See, a surrender charge is an incentive to take advantage of tax deferment.  **If you're going to put your money in and take it out, put it in and take it out, an annuity is not for you.**  I like surrender charges, honestly. I like surrender charges. The reason I like them is – is, number one, the – the longer the surrender charge – okay? – means the insurance company is able to invest the money to get better rates of return for the consumer because they are investing for longer term investments which have better returns.

(Doc. # 130-3 at 179) (emphasis added).  He also told his attendees that if one of their clients wants the "highest returns," then "you've got the wrong client."  (*Id.* at 76.) However, in doing so, he implied that if a person is a senior, they are **always** the right client for an annuity, because seniors are "only concerned" about factors **other** than high rates of return:

> [W]hen you're selling annuities, [senior clients are] only interested in three things, and that's it. They're only interested in, number one, is my money safe; number two, can I get it if I need it; and number three, will I get a fair return.  **They don't want—oh, I want the highest returns, I want the S&P, and I want this and that.  Maybe if you have somebody like that, you've got the wrong client.**

(*Id.* at 76) (emphasis added).  And, in his later statements, Mr. Clark stated that "[i]n the real world, [seniors] never touch their money.  Seniors put their money in annuities, I'm sorry, but they never touch it.  **They never take it out**." (*Id.* at 186-87) (emphasis added).

Indeed, Mr. Clark actually told his attendees that suitability of an annuity is

determined by the consumer (not the salesperson), and although he says that the

consumer will make this decision after being given "all the information about [the]

product," it is critical to remember that, in light of the sales context of the seminar, he is

referring to a consumer who will make this determination after hearing Clark's own sales

pitches in favor of annuities.  Additionally, Mr. Clark also makes it clear that the

"suitability" bar is incredibly low – asserting that even if a senior citizen buys an annuity

merely to prevent a child from spending his or her inheritance quickly (something he

asserts elsewhere is a very common concern of seniors),[11] **this alone** would make it a

"suitable" product for that consumer.  In Mr. Clark's own words:

> You know, we have issues today within our business about suitability.
> And do you know that the -- the regulators refuse to define "suitability"?
> And the insurance companies are trying to get a handle on it.  They don't
> know how.  And I say to the companies, I say, look, **you know when you
> take all the benefits of annuities, all the things I'm talking about, but
> if a person buys an annuity for just this one benefit [protection from
> their children spending their inheritance very quickly], is it suitable?
> Well, gosh, I guess it is.  Now, let me define 'suitability.'  If the
> consumer feels after giving all the information about a product, what
> it does, what it doesn't do, how it works, doesn't work, and they want
> the product, it is suitable**.  It is suitable.

(*Id.* at 155-56) (emphasis added).

Plaintiffs also allege that the unedited footage would show Clark "**stressing

BCA's code of ethics which require full disclosure** of various advantages and

disadvantages of annuity products."  *Brokers' Choice of Am., Inc.*, 757 F.3d at 1139

(emphasis added).  However, such a "code" – let alone one that "requires full disclosure

of the various advantages and disadvantages of annuity products" – is **never** mentioned

---

[11] *See* (Doc. # 130-3 at 33, 156-57).

in the outtakes, much less "stressed" by Mr. Clark, and Plaintiffs do not allege that the

BCA Code of Ethics was ever distributed to, much less discussed with, AU attendees.

Plaintiffs also point to the fact that the seminar, through Mr. Hoyle, suggested agents

"become connected with" the Better Business Bureau (BBB), the Chamber of

Commerce, and the National Ethics Bureau (NEB).  However, Mr. Hoyle did not make

this suggestion in an effort to encourage ethical practices; rather, he made it in a

discussion of how the attendees could pay a "nominal fee" and use these organizations'

names for marketing purposes.  For example, with respect to the BBB, Mr. Hoyle stated:

> Get connected with the Better Business Bureau. The Better Business
> Bureau may seem like an archaic animal, but I'm telling you, if you're
> working with the senior market, they still rely on the Better Business
> Bureau to check you out. . . . [The process involves a] nominal fee, usually
> about 2-300 dollars, depending on where you are.  The great thing is if
> you go for I believe it is three or four years without any complaints, they
> bump you up to a different level, and they provide you with a little plaque
> that you can put in your office and all that kind of stuff.  Just create -- you
> know, it's all about that credibility image that you create.

(Doc. # 130-4 at 75-76.)  As for the NEB, Mr. Hoyle does note that joining it requires

somewhat more than a "nominal fee" – specifically, it requires a background check ("I

think it's a seven-year or nine-year background check on the state and federal level to

verify information that you provide to them that you are, you know, not, you know,

wanted for arson or murder or anything like that.") (*Id.* at 76.)  Again, however, he

emphasizes that this is a worthy step to take **for marketing purposes**, not for the

purpose of education about ethics, explaining that, upon being approved:

> [Y]ou get the use of the National Ethics Bureau logo – they have
> customizable brochures that you can use as well – and the National Ethics
> Bureau profile.  What that means is there is a portion of their Web site that
> is set aside for advisors, such as yourself, that you can direct your clients
> to.  **This is another added layer of credibility**.  You can direct them to

> that page, it gives you a rundown of everything that you -- all the checks and balances they've done to check that you are a viable, credible financial advisor.")  . . . And the National Ethics bureau logo, once you are a member in good standing, you have the right to use that logo on any and all materials that you put out.  Anything that you do, you have the right to use that logo.

(Id. at 77-78) (emphasis added).  He also explained that the NEB's endorsement was a "great service that they provide," because "I mean, again, it's a fairly nominal cost for that layer of the credibility that you're adding.  So I encourage you guys to give them a call."  (Id. at 79) (emphasis added).

Mr. Hoyle noted that advertising with the Chamber of Commerce was usually "free" and in no way discussed ethical practices: "Chamber of commerce is another great tool to have because, you know, oftentimes folks that move into new communities, they get welcome packets from the chamber of commerce.  A lot of chambers have guides that they provide to folks in their area as well, and usually those are free. So advertisement in that is a freebie.  Okay?"  (Id. at 76.)

Ultimately, although they point to vague and general statements Mr. Clark made about the importance of acting in an "ethical" manner as a salesperson and "caring" about clients (for example, in the context of a statement that his attendees were "bringing a priceless value to the table. You're bringing your honesty, and you bring in your ethics, and you bring in your trust, and you bring in your care about your client. You can't put a price on that"), such statements do not, in fact, shore up its allegation about the fact that he told attendees that there was an **ethical code requiring full disclosure**, nor do they specifically rebut the "gist" of the *Dateline* show – that is, that

agents were taught to use "scare tactics" and to mislead seniors in selling sometimes-

unsuitable products.

## THE GIST OF THE BROADCAST: MISLEADING CREDENTIALS

Towards the end of its coverage of AU, *Dateline* shows footage of AU vendors,

and states:

> *But that's not all that goes into convincing seniors to buy. You have to make sure they believe you know what you're talking about -- that you have credibility. At Annuity University, **Dateline discovered part of an underground industry that helps insurance agents puff up their credentials and mislead you about who they really are**.*
> (hidden camera)
> *Dateline*: Which are the books that we can write with you?
> Richard Duff: This one.
> *Want to look like a respected author? This man will let you put your name on the cover of one of his financial books. All you have to do is write a short biography. And oh, by the way -- give him a few thousand dollars.*
> *Dateline*: Instead of just your name.
> Richard Duff: We'll put the three of us on here.
> *Dateline*: Isn't that cool?
> Richard Duff: It is good. And it's your first chapter, there's room for five or six, seven pages, all about the way you're looking at things, and phone numbers, contact information.
> *He's not alone. At Annuity University, this ad says you can be the author of a book called "Alligator Proofing Your Estate". Apparently, agents like the idea of pretending to be authors, because Dateline found copies of the same "Alligator" book supposedly co-written by Jeffrey D. Lazarus, Steven Delott, and Ronald and Robert Russell.*
> *Want to sound like a respected financial expert on a nationally syndicated radio show? At Annuity University, you can buy that too.*
> *(hidden camera)*
> Jeff Hoyle: Response radio is a pre-scripted radio show, for lack of a better word.
> *This trainer is explaining how, for a price, an insurance agent can pretend to be a guest on the radio. They'll send you the script, already written. Then, the radio host will call and record you.*
> *Dateline*: And Rick would interview us?
> Jeff Hoyle: Yes.
> *Dateline*: On Dateline: On the show?
> Jeff Hoyle: Yes. Yes. You are like the interview-- you are like the guest speaker on "Senior Concerns" talk show.

> *And, before long, you'll be armed with CDs of your guest appearance to*
> *help impress customers.  Tyrone Clark says it's all part of the formula for*
> *selling annuities.  But Attorney General Swanson says tactics like that can*
> *lead to abuse.*
>> Lori Swanson: He is basically handing them loaded guns so they
>> can walk into the senior's home and rip them off

(Doc. # 130-7 at 11-12.)

Plaintiffs also allege that this portion of Dateline's portrayal of the seminar was

misleading, because:

> the March seminar shows [Mr. Clark] strongly recommending agents
> bolster their credibility by writing newspaper articles or starting a late-night
> show on a local radio channel discussing financial planning, as opposed to
> Dateline's characterization that he promotes false credentials by way of
> ghost-written pamphlets.  As to the book referred to on *Dateline*, Clark
> alleged this book was not in use at the time of the October seminar.
> Instead, the book then and now available at Annuity University has one
> personal chapter written by the agent, and the remainder clearly discloses
> it is authored by a recognized financial expert.

*Broker's Choice*, 757 F.3d at 1139 (emphasis added); *see also* (Doc. # 39, ¶¶ 111,

113.)  Nevertheless, a comparison with the outtakes shows that Dateline's

characterization of Mr. Clark's seminar – as advocating that his attendees "puff up their

credentials and mislead [potential clients] about who they really are" – was, in fact,

substantially true.

Specifically, Mr. Hoyle stated that his business (Sundance Public Relations,

which he describes as the "public relations arm of Broker's Choice") would sell

attendees "[g]host-written articles" ("if you don't want to take the time to write the article,

then just give me a call, and **we can write it for you.  We can write it in whatever**

**context you want it written in on pretty much whatever topic you want it written**

**on**"), and mentioned that these articles could be placed in smaller newspapers, such as

newsletters for retirement communities, as a way of attracting clients.   (Doc. # 130-4 at 51-53) (emphasis added).  Nowhere do Mr. Hoyle (or Mr. Clark) state that this "ghost-written" article discloses that its author is not, in fact, the true author or that the content was paid for.  Similarly, Mr. Hoyle discusses how BCA sells so-called "co-authored" books – specifically mentioning the "Alligator Proofing Your Estate" book – which *Dateline* (by quoting Mr. Hoyle) accurately describes as involving a single "chapter" (a "short biography") (amounting to five to seven pages) "written" by the purchaser ("And it's your first chapter, there's room for five or six, seven pages, all about the way you're looking at things, and phone numbers, contact information.")

Dateline's description of the "radio show" is also substantially true: Mr. Hoyle specifically acknowledges that the "show" on which the guests must make an appearance is not an actual, syndicated show on which an attendee would appear as a guest (based, presumably, on expertise), but rather, a pre-scripted marketing device that is purchased by the attendee.  Specifically, he explained how the broker purchases airtime from a radio station and records comments that have been written for him or her by BCA, giving the appearance that the broker is a call-in guest "on a syndicated show called Senior Concerns":

> HOYLE:  Response radio is a pre-scripted radio show, for lack of a better word.  How we do it is that it is pre-scripted based on a show that Tyrone did about a year and a half ago with a gentleman out of San Francisco by the name of Alan Kaplan, and it is called "The 10 Concerns Every Senior Should Be Aware Of." . . .  Now, **recording is done as if you were the call-in guest on a syndicated show called Senior Concerns.  And Senior Concerns is copyrighted show that we own the copyright to.  How convenient, right**?  Once that's done, Rick takes that finished end piece, edits it down into the format that we agree upon. . . .  **It is completely edited for radio air play, so if you wanted to walk into a radio station and offer this piece to them and buy an hour of air time,**

**all they have to do is plug it** in and have somebody listen along with it that knows where to plug in the station ID and maybe the commercials, things like that. . . .  So it does work.  **You know, it is a plausible product that can work for you. It can work to your benefit**.

(Doc. # 130-4 at 42-43.)  Mr. Hoyle drives home the fact that this show is purchased (rather than earned) media, when, in response to a question from a member of the audience about how often the "show" "airs," he stated, "It's pretty much up to how much time you want to purchase," and also when he noted that "you really can't get a guarantee to play unless you purchase the time." (*Id.* at 44, 49.)  He also mentioned that attendees could purchase the show for $1,995, which would include the cost of "the preproduction, the actual production of the piece.  It comes with customized artwork on the CD itself as well as customized jewel cases." (*Id.* at 45.)

## III.  CONCLUSION

The Court has examined the totality of the circumstances presented by the entirety of Mr. Clark's "Annuity University" seminar by reviewing the full, unedited transcripts of the seminar and comparing them to the full *Dateline* broadcast; that comparison did not clearly and convincingly show the aired statements would have left viewers with a false impression of the gist of Clark's seminars.  Instead, *Dateline*'s portrayal of what occurred at the seminar was, in fact, "substantially true"; consequently, Plaintiffs were not defamed.  Accordingly, Defendants' Motion to Dismiss (Doc. # 111) is granted, and this case is dismissed with prejudice, in its entirety.[12]  It is FURTHER

---

[12] The Court may dismiss without granting leave to amend when it would be futile to allow the plaintiff an opportunity to amend his complaint.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Because the nature of the defamation claim in this case requires only that the Court look to the allegations of the Complaint and compare them to the *Dateline* broadcast and the entire transcript of the AU seminar, further amendment of the Complaint would be futile.

ORDERED that Plaintiffs' Unopposed Motion for Hearing/Conference (Doc. # 137) and

their Motion for Reconsideration regarding the Magistrate Judge's Recommendation on

Motion for Discovery (Doc. # 144) are hereby denied as moot.

DATED:  September 29, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge